**DIRECTV, INC. ET AL., APPELLANTS, *v.* LEVIN, TAX COMMR., APPELLEE.**

**[Cite as *DIRECTV, Inc. v. Levin*, 128 Ohio St.3d 68, 2010-Ohio-6279.]**

*Taxation — Sales tax — R.C. 5739.01(B)(3)(p) — Satellite-broadcasting services*
*— Taxation of sales of satellite-broadcasting services but not of cable-*
*broadcasting services does not violate Commerce Clause of United States*
*Constitution — Differential tax treatment of two categories of companies*
*is constitutional when difference results solely from nature of business and*
*not from location of companies' activities.*

(No. 2009-0627 — Submitted October 13, 2010 — Decided December 27, 2010.)

APPEAL from the Court of Appeals for Franklin County, No. 08AP-32,

181 Ohio App.3d 92, 2009-Ohio-636.

_____

**SYLLABUS OF THE COURT**

1. The Commerce Clause of the United States Constitution protects the interstate
    market, not particular interstate firms or particular structures or methods
    of operation in a retail market. (*Exxon Corp. v. Gov. of Maryland* (1978),
    437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91, followed.)

2. The imposition of a sales tax by the Ohio General Assembly on satellite
    broadcasting services but not on cable broadcasting services does not
    violate the Commerce Clause of the United States Constitution, because
    the tax is based on differences between the nature of those businesses, not
    the location of their activities, and it does not favor in-state interests at the
    expense of out-of-state interests. (*Kentucky Dept. of Revenue v. Davis*
    (2008), 553 U.S. 328, 128 S.Ct. 1801, 170 L.Ed.2d 685; *Amerada Hess*
    *Corp. v. Dir., Div. of Taxation, New Jersey Dept. of Treasury* (1989), 490

U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58; and *DIRECTV, Inc. v. Treesh* (C.A.6, 2007), 487 F.3d 471, followed.)

————————

**O'DONNELL, J.**

{¶ 1} DIRECTV, Inc., and EchoStar Satellite, L.L.C. ("the satellite companies") appeal from a decision of the Tenth District Court of Appeals and ask us to consider whether the imposition of a sales tax on the retail sale of satellite broadcasting services without also imposing the same tax on cable broadcasting services violates the Commerce Clause of the United States Constitution. As other jurisdictions that have considered this same issue have done, we conclude that the Commerce Clause protects the interstate market, not particular interstate firms or particular structures or methods of operation in a retail market. The imposition of a sales tax by the Ohio General Assembly on satellite broadcasting services but not on cable broadcasting services does not violate the Commerce Clause of the United States Constitution, because the tax is based on differences between the nature of those businesses, not the location of their activities, and it does not favor in-state interests at the expense of out-of-state interests. Accordingly, the judgment of the court of appeals is affirmed.

**Factual History**

*Satellite and Cable Broadcasting Services*

{¶ 2} The satellite companies provide pay-television programming services to consumers in Ohio and other states using satellites in fixed orbits above the earth. The satellite companies purchase signals for this programming from local broadcast stations, broadcast television networks (ABC, CBS, Fox, and NBC), and providers of cable programming (such as CNN, ESPN, and HBO). They then transmit these signals from uplinks located outside Ohio to the satellites, which in turn send the signal directly to small satellite dish antennas mounted on or near the home of the subscriber to be received by a decoder box

and displayed on the subscriber's television. Other than the antenna and receiver at the subscriber's home, this method of delivery does not require the use of additional ground-receiving and/or distribution facilities in Ohio.

{¶ 3} In the pay-television market, the satellite companies – neither of which is headquartered in Ohio – compete with cable companies, which use ground receiving and distribution facilities to provide television programming to customers. For cable television distribution, the process begins at the "headend," a facility, usually located in or near the franchise area, that contains the collection of antennas that the cable television provider uses to gather programming from local, in-state, and out-of-state sources. However, with cable company consolidation and technological advances, there has been a reduction in the number of headends, and some cable companies use headends located out of state. From the headend, coaxial or fiber-optic cables and amplifiers located either on utility poles or below the ground carry the signal to "hubs" servicing areas of 10,000 to 20,000 customers, which then direct the signal through feeder lines to "nodes" serving particular neighborhoods.

{¶ 4} These cables run along public rights of way, and cable companies enter franchise agreements with local governments and pay a franchise fee to secure this right of access. The franchise fee may vary by locality, but federal law prohibits the fee from exceeding five percent of gross revenues. While the cable companies' mode of distribution necessitates a local footprint, none of the major cable companies operating in Ohio are headquartered in Ohio, and all serve an interstate market.

*The Sales Tax on Satellite Broadcasting Service*

{¶ 5} Prior to 2003, Ohio did not tax sales of cable or satellite television service. That year, however, the General Assembly considered a bill that would have taxed sales of both services equally. H.B. No. 95, as introduced in the 125th General Assembly, proposed to enact R.C. 5739.01(B)(3)(q) to define "sale" as

including "transactions by which * * * [c]able and satellite television service is or is to be provided."  As a result, the cable and satellite television industries retained lobbyists to protect their interests, and ultimately the legislature amended the bill to enact a sales tax on "satellite broadcasting service" alone.  See R.C. 5739.01(B)(3)(p) (150 Ohio Laws, Part I, 396, and Part II, 1996).  The General Assembly's definition of "satellite broadcasting service" in R.C. 5739.01(XX) does not include transactions involving the distribution of pay-television programming using ground receiving or distribution equipment, and the sale of cable television programming is therefore not subject to the tax.

**Procedural History**

{¶ 6}   In response to this legislation, the satellite companies filed a declaratory-judgment complaint in the Franklin County Common Pleas Court seeking a declaration that the tax on sales of satellite television service but not on sales of cable television service had both the purpose and effect of favoring in-state economic interests in violation of the Commerce Clause.

{¶ 7}   The trial court entered a partial summary judgment in favor of the satellite companies, declaring the sales tax on satellite broadcasting services to be unconstitutional because "[t]he differential tax treatment of [satellite and cable television providers] is directly correlated with whether they use certain *local* ground receiving and distribution equipment. * * * [T]he practical effect of the differential tax treatment is to benefit in-state economic interests while burdening out-of-state economic interests, thereby discriminating against interstate commerce in violation of the Commerce Clause * * *."  (Emphasis sic.)

{¶ 8}   The trial court also concluded that a genuine issue of material fact existed regarding whether the General Assembly had intentionally discriminated against interstate commerce in levying the tax, and the court denied summary judgment on that issue.  However, the court rejected the satellite companies'

argument that the sales tax facially discriminated against interstate commerce, a position the satellite companies have since abandoned.

{¶ 9} The tax commissioner appealed, and the Tenth District Court of Appeals reversed the judgment of the trial court and held that the Commerce Clause is not violated when the differential tax treatment of two categories of companies results solely from differences between the nature of their businesses, not from the location of their activities. *DIRECTV v. Levin*, 181 Ohio App.3d 92, 2009-Ohio-636, 907 N.E.2d 1242. The court explained that because both of these providers are engaged in interstate commerce, the sales tax did not discriminate against the interstate market for pay television, but merely against one interstate company competing in that market. Id. at ¶ 27–28. The appellate court further determined that the trial court erred in denying the tax commissioner's motion for summary judgment on the issue of whether there was purposeful discrimination and directed the trial court to enter summary judgment for the tax commissioner on all claims. Id. at ¶ 35.

{¶ 10} We accepted the satellite companies' discretionary appeal. *DIRECTV, Inc. v. Levin*, 122 Ohio St.3d 1454, 2009-Ohio-3131, 908 N.E.2d 945.

*Arguments on Appeal*

{¶ 11} The satellite companies urge that the sales tax imposed by R.C. 5739.01(B)(3)(p) discriminates against interstate commerce in practice because the tax gives preferential treatment to "cable TV companies [that] have invested a fortune in building and maintaining a network of 'ground receiving or distribution equipment' – including thousands of buildings and tens of thousands of miles of cable – in Ohio," while satellite service is taxed "because its providers have devised a way to deliver the same service without installing any 'ground or receiving or distribution equipment' in Ohio." According to the satellite companies, a state may not distinguish between companies engaged in interstate commerce if the distinction turns on the extent of economic investment in the

state, notwithstanding any differences in the manner in which the firms conduct business. Thus, they maintain that any discrimination in tax treatment that depends on the existence of ground receiving or distributing equipment in Ohio is unconstitutional.

{¶ 12} The satellite companies also assert that the court of appeals left undisturbed the trial court's conclusion that a genuine issue of material fact remains regarding whether the General Assembly intentionally discriminated against them in enacting R.C. 5739.01(B)(3)(p), and they argue that statements made by lobbyists for the cable industry to legislators regarding the statute's purpose and effect are relevant and admissible in proving discrimination against interstate commerce.

{¶ 13} The tax commissioner responds that the tax "simply differentiates between two forms of interstate commerce, not between a local economic activity and an out-of-state economic activity." Tax differentials, he asserts, are not "prohibited simply because the business adversely affected by the tax treatment generates less economic activity in the subject state than the business that received favorable tax treatment." The tax commissioner maintains that even if the tax technically discriminates against commerce, the sales tax may be "properly sustained as 'compensatory' or 'complementary' " to the franchise fees imposed on cable companies. Also, he contends that the satellite companies have abandoned the issue of intentional discrimination.

{¶ 14} Accordingly, we are called upon to consider whether the sales tax levied by R.C. 5739.01(B)(3)(p) on satellite broadcasting services but not on cable broadcasting services discriminates against interstate commerce in violation of the Commerce Clause.

## Law and Analysis

*Standard of Review*

**{¶ 15}** At the outset, we note that our review of a summary judgment is de novo. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9.

**{¶ 16}** In determining whether a law discriminates against interstate commerce, the United States Supreme Court has "eschewed formalism for a sensitive, case-by-case analysis of purposes and effects." *W. Lynn Creamery, Inc. v. Healy* (1994), 512 U.S. 186, 201, 114 S.Ct. 2205, 129 L.Ed.2d 157. Further, as the court explained in *Hughes v. Oklahoma* (1979), 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250, "[t]he burden to show discrimination rests on the party challenging the validity of the statute" – in this case, the satellite companies.

*The Dormant Commerce Clause*

**{¶ 17}** The United States Constitution provides that Congress shall have the power "[t]o regulate Commerce * * * among the several States." Clause 3, Section 8, Article I. However, although the terms of the Commerce Clause "do not expressly restrain 'the several States' in any way," the Supreme Court has "sensed a negative implication in the provision since the early days." *Kentucky Dept. of Revenue v. Davis* (2008), 553 U.S. 328, 337, 128 S Ct. 1801, 170 L.Ed.2d 685. Thus, the court has "long interpreted the Commerce Clause as an implicit restraint on state authority." *United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Mgt. Auth.* (2007), 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655. This concept of "negative implication" and "implicit restraint" is known as the "negative" or "dormant" Commerce Clause.

**{¶ 18}** The doctrine of the dormant Commerce Clause traces its roots to "[t]he desire of the Forefathers to federalize regulation of foreign and interstate commerce." *H.P. Hood & Sons, Inc. v. Du Mond* (1949), 336 U.S. 525, 533, 69 S.Ct. 657, 93 L.Ed. 865. As the court explained in *Camps Newfound/Owatonna, Inc. v. Harrison* (1997), 520 U.S. 564, 571, 117 S.Ct. 1590, 137 L.Ed.2d 852, "During the first years of our history as an independent confederation, the National Government lacked the power to regulate commerce among the States. Because each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents, what Justice Johnson characterized as a 'conflict of commercial regulations, destructive to the harmony of the States,' ensued." Id., quoting *Gibbons v. Ogden* (1824), 22 U.S. (9 Wheat.) 1, 224, 6 L.Ed. 23 (Johnson, J., concurring).

**{¶ 19}** Accordingly, the modern cases arising under what has become known as the dormant Commerce Clause are "driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " *Kentucky Dept. of Revenue*, 553 U.S. at 337–338, 128 S.Ct. 1801, 170 L.Ed.2d 685, quoting *New Energy Co. of Indiana v. Limbach* (1988), 486 U.S. 269, 273–274, 108 S.Ct. 1803, 100 L.Ed.2d 302. The dormant Commerce Clause thus enshrines the economic policy of the framers to prohibit states from erecting barriers to free trade across state borders and from enacting laws that favor local enterprises at the expense of out-of-state businesses. *Boston Stock Exchange v. New York State Tax Comm.* (1977), 429 U.S. 318, 328-329, 97 S.Ct. 599, 50 L.Ed.2d 514.

**{¶ 20}** The Supreme Court has therefore recognized that "[n]o State, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce * * * by providing a direct commercial advantage to local business.' " (Ellipsis sic.) Id. at 329, quoting *Northwestern States Portland Cement Co. v. Minnesota* (1959), 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421.

**{¶ 21}** The court has pointed out, however, that the Commerce Clause of the United States Constitution "protects the interstate market, not particular interstate firms" or "particular structure[s] or methods of operation in a retail market." *Exxon Corp. v. Gov. of Maryland* (1978), 437 U.S. 117, 127, 98 S.Ct. 2207, 57 L.Ed.2d 91. Therefore, differential tax treatment of "two categories of companies result[ing] solely from differences between the nature of their businesses, [and] not from the location of their activities," does not violate the dormant Commerce Clause. *Amerada Hess Corp. v. Dir., Div. of Taxation, New Jersey Dept. of the Treasury* (1989), 490 U.S. 66, 78, 109 S.Ct. 1617, 104 L.Ed.2d 58.

**{¶ 22}** Relying on the decisions of the United States Supreme Court in *Exxon* and *Amerada Hess*, every state and federal court considering Commerce Clause challenges brought by the satellite industry arguing against state tax measures as favoring the cable industry has held that these taxes do not violate the dormant Commerce Clause because they do not discriminate against interstate commerce.

**{¶ 23}** In *DIRECTV, Inc. v. Treesh* (E.D.Ky.2006), 469 F.Supp.2d 425, the court considered a Kentucky tax statute that imposed a sales tax on both satellite and cable services but prohibited local governments from imposing franchise fees on cable companies while allowing cable companies a tax credit for the amount of any such fee imposed. The satellite companies claimed that allowing cable companies free access to public rights-of-way to install infrastructure within the state of Kentucky gave the cable companies a tax advantage not shared with satellite companies, whose service is provided through satellites located outside the state of Kentucky.

**{¶ 24}** The district court dismissed the complaint, finding that the tax did not distinguish between in-state and out-of-state economic interests and had neither discriminatory purpose nor effect. The court noted that the cable

companies could not be characterized as in-state interests and that "[t]he different effects of Kentucky's new tax provisions on Satellite Companies and Cable Companies are owed not to the geographic location of the companies, but to their different delivery mechanisms," explaining that the tax statute had the same effect regardless of whether the satellite or cable companies located their operations inside or outside the state. Id. at 437-438.

{¶ 25} The Sixth Circuit Court of Appeals affirmed and noted: "While *a* purpose of the [Kentucky tax statute] might have been to aid the cable industry rather than the satellite industry because the former has a larger in-state presence than the latter, there were clearly *many other* purposes including assessing some tax against a satellite industry that is rapidly growing * * *." (Emphasis sic.) *DIRECTV v. Treesh* (C.A.6, 2007), 487 F.3d 471, 480.

{¶ 26} The court went on to recognize that (1) cable and satellite companies provide consumers with two distinct goods, "consisting of two very different means of delivering broadcasts," id. at 480, (2) "the dormant Commerce Clause is intended to protect interstate commerce, and not particular firms engaged in interstate commerce, or the modes of operation used by those firms," id. at 481, and (3) "differential tax treatment of 'two categories of companies result[ing] solely from differences between the nature of their businesses, [and] not from the location of their activities' does not violate the dormant Commerce Clause." Id., quoting *Amerada Hess*, 490 U.S. at 78, 109 S.Ct. 1617, 104 L.Ed.2d 58. The Sixth Circuit emphasized that "applying the dormant Commerce Clause in cases that do not present the equivalent of a protective tariff" — i.e., where the tax does not draw geographic lines, favor local products, or promote local companies — would "dramatically increase the clause's scope." 487 F.3d at 481. The Supreme Court of the United States denied a writ of certiorari. See *DIRECTV, Inc. v. Treesh* (2008), 552 U.S. 1311, 128 S.Ct. 1876, 170 L.Ed.2d 746.

{¶ 27} In addition, the satellite companies challenged a North Carolina statute that imposed a sales tax on "direct-to-home satellite service" but not on cable television service. The North Carolina Court of Appeals rejected the Commerce Clause challenge, explaining that the tax "does not make any geographical distinctions, but merely describes one method of providing television programming services to North Carolina subscribers." *DIRECTV, Inc. v. State* (2006), 178 N.C.App. 659, 663, 632 S.E.2d 543. Moreover, the tax "does not discriminate against [the satellite companies] in favor of a local industry [because] cable companies are no more 'local' in nature than are satellite companies." Id. at 664. See also *DIRECTV, Inc. v. Tolson* (E.D.N.C.2007), 498 F.Supp.2d 784, 800, affirmed (C.A.4, 2008), 513 F.3d 119 (dismissing the satellite companies' complaint on other grounds, but explaining that the amended North Carolina statute imposing an equal tax on satellite and cable companies while revoking authority of local government to impose franchise fees does not violate the Commerce Clause).

*The Ohio Sales Tax*

{¶ 28} R.C. 5739.02 imposes a tax "on each retail sale made in this state." R.C. 5739.01(B)(3)(p) defines "sale" to include "transactions for a consideration in any manner" by which "satellite broadcasting service is or is to be provided." R.C. 5739.01(XX) further defines "satellite broadcasting service" to mean "the distribution or broadcasting of programming or services by satellite directly to the subscriber's receiving equipment *without the use of ground receiving or distribution equipment*, except the subscriber's receiving equipment or equipment used in the uplink process to the satellite." (Emphasis added.) As the parties agree, the phrase "without the use of ground receiving or distribution equipment" clarifies that sales of cable broadcasting services are not subject to the tax.

{¶ 29} In reviewing the application of this statute to the facts here, we conclude that the sales tax imposed on satellite broadcasting services but not cable

11

broadcasting services does not violate the Commerce Clause of the United States Constitution. The statute's application depends on the technological mode of operation, not geographic location, and while it distinguishes between different types of interstate firms, it does not favor in-state interests at the expense of out-of-state enterprises. See *DIRECTV*, 487 F.3d at 480-481; *DIRECTV*, 469 F.Supp.2d at 437-438; *DIRECTV*, 498 F.Supp.2d at 800; *DIRECTV*, 178 N.C.App. at 663, 632 S.E.2d 543.

{¶ 30} Here, the tax applies to a transaction involving pay-television services depending only on the technological mode of distribution of those services. The General Assembly used the phrase "ground receiving or distribution equipment" in R.C. 5739.01(XX) to track the definition of "direct-to-home satellite service" set forth in the notes to Section 152, Title 47, U.S.Code, which authorize states to tax satellite-television service. See Pub.L. No. 104-104, Title VI, Section 602(b)(1), 110 Stat. 144 (1996). The General Assembly defined "satellite broadcasting service" to correspond with this federal authorization and to identify the taxable transaction by the method of distributing pay-television services, not to protect companies that have invested in a ground distribution system or to encourage investment in such a system.

{¶ 31} Application of the sales tax does not depend on the geographic location of the programming provider. Rather, the sale of satellite broadcasting services is subject to tax regardless of whether the provider is an in-state or out-of-state business and without considering the amount of local economic activity or investment in facilities that the satellite companies bring to Ohio. A satellite company that is headquartered in Ohio, builds its uplink in Ohio, employs only Ohio residents, and provides programming only to Ohio customers is as responsible for collecting the tax as any out-of-state company providing the same services using the same mode of distribution.

**{¶ 32}** Conversely, the cable industry is not a local interest benefited at the expense of out-of-state competitors. Like the satellite companies, the major cable providers are interstate companies selling an interstate product to an interstate market. Both the satellite and cable industries serve customers in Ohio, own property in Ohio, and employ residents of Ohio, but no major pay-television provider is headquartered in Ohio or could otherwise be considered more local than any other. Thus, the sales tax does not reflect "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Oregon Dept. of Environmental Quality* (1994), 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13. Rather, the tax regulates among these interests even-handedly based on the technological mode of operation.

**{¶ 33}** The cases on which the satellite companies rely are distinguishable. In *Granholm v. Heald* (2005), 544 U.S. 460, 125 S.Ct. 1885, 161 L.Ed.2d 796, the states of Michigan and New York imposed regulations allowing in-state, but not out-of-state, wineries to make direct sales to customers, while in *Bacchus Imports, Ltd. v. Dias* (1984), 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200, the state of Hawaii excepted certain alcoholic beverages using locally produced ingredients from the state liquor tax. In *Armco Inc. v. Hardesty* (1984), 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540, the state of West Virginia imposed a wholesale tax on goods manufactured out of state but not on goods made in state, and in *Westinghouse Elec. Corp. v. Tully* (1984), 466 U.S. 388, 390, 104 S.Ct. 1856, 80 L.Ed.2d 388, the state of New York gave a tax credit only to those corporations whose subsidiaries exported goods from New York. And in *Boston Stock Exchange*, 429 U.S. at 328-329, 97 S.Ct. 599, 50 L.Ed.2d 514, the state imposed a greater tax liability on out-of-state transactions than on in-state transactions.

{¶ 34} In those cases, the respective states acted to protect local interests at the expense of out-of-state competitors. In sharp contrast, the Ohio tax does not protect local industries or treat in-state companies differently from out-of-state companies, nor does it provide a tax incentive for companies to move operations or direct business to Ohio.

{¶ 35} Therefore, we concur with those courts that have considered the merits of the satellite companies' dormant Commerce Clause claims and conclude that the Ohio sales tax on satellite broadcasting services does not discriminate against interstate commerce in violation of the Commerce Clause of the United States Constitution.

*The Admissibility of Lobbyist Statements*

{¶ 36} The satellite companies assert that statements made by lobbyists for the cable industry are admissible to prove both the practical effect of the sale tax and the intent of the General Assembly in enacting it. We need not reach the merits of this claim.

{¶ 37} Assuming for purposes of this argument that the statements would be admissible to prove the discriminatory effect of the sales tax, these statements would not affect our conclusion that the sales tax does not discriminate against commerce in practical effect.

{¶ 38} And to the extent that the satellite companies rely on the lobbyist statements to show that the General Assembly passed the sales tax with a discriminatory intent, we are unable to reach that issue because the satellite companies failed to preserve their intentional-discrimination claim for our review. Here, the court of appeals reversed the trial court's decision to deny summary judgment in favor of the tax commissioner on the claim that the state purposefully discriminated against interstate commerce, ordering "the trial court to enter summary judgment for defendant-appellant Richard A. Levin, Tax Commissioner

of Ohio" and ending this litigation subject only to appeal. *DIRECTV*, 181 Ohio App.3d 92, 2009-Ohio-636, 907 N.E.2d 1242, ¶ 6, 29, and 35.

{¶ 39} However, in their memorandum in support of jurisdiction in this court, the satellite companies did not argue that the court of appeals erred by ordering summary judgment for the tax commissioner on this issue. They sought review only of the evidentiary issue regarding whether evidence of lobbyist statements is relevant and admissible. Not only did the satellite companies fail to attack the order directing summary judgment against them in their initial brief filed here, but they also asserted that the appellate court had not actually ruled against them on this point.

{¶ 40} By failing to challenge the decision granting summary judgment in favor of the tax commissioner on the intentional-discrimination claim in either their memorandum in support of jurisdiction or their initial brief, the satellite companies failed to preserve that claim for review. See, e.g., *Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Dev. Disabilities*, 102 Ohio St.3d 230, 2004-Ohio-2629, 809 N.E.2d 2, ¶ 18 (declining to consider issues not set forth in the appellant's memorandum in support of jurisdiction); *Utility Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 54 (explaining that the appellant "failed to preserve" an argument "raised for the first time on reply"). Accordingly, we decline to address this issue.

## Conclusion

{¶ 41} Differential tax treatment of two categories of companies resulting solely from differences between the nature of their businesses, not from the location of their activities, does not violate the Commerce Clause of the United States Constitution. The Ohio General Assembly imposed a sales tax that makes no distinction between local and interstate commerce, but rather distinguishes based only on the mode of distributing television programming. For these reasons, the judgment of the court of appeals is affirmed.

Judgment affirmed.

LUNDBERG STRATTON, O'CONNOR, LANZINGER, and CUPP, JJ., concur.

BROWN, C.J., and PFEIFER, J., dissent.

_____

**BROWN, C.J., dissenting.**

{¶ 42} Cable companies and satellite companies sell the same thing: pay-television service. But in Ohio they are not taxed the same. Satellite companies must collect the 5 1/2 percent sales tax; cable companies do not.

{¶ 43} Why the difference? When the tax bill was introduced, it imposed an equal tax regardless of seller. Cable-television lobbyists stepped in and drew the legislature's attention to certain economic realities: the cable industry directly employs exponentially more Ohioans (6,000) than the satellite industries (a "nominal" number) and pays exponentially more taxes (over $100 million annually) than satellite ("nominal" amounts). According to the cable industry, "the proposed sales tax on cable service penalizes the cable industry for [its] deep roots in this state and rewards a competing out-of-state industry who profits from Ohioans." That "out-of-state industry" is the satellite industry, which "[p]rovides Ohioans with very few job opportunities," "[d]oesn't pay an appreciable tax of any kind anywhere in Ohio," and "[p]rovides little support to local communities."

{¶ 44} What the cable companies could see, the majority cannot: it is in Ohio's economic interest to support the cable industry's jobs and investment, and relieving the cable industry of the sales tax benefits that interest. I am all in favor of promoting employment and investment in this state, but as I read the law, this particular road is not open to us.

### States May Not Impose Discriminatory Taxes to Favor
### Local Jobs and Investment

{¶ 45} The black-letter rule is clear. The Commerce Clause forbids states to discriminate against interstate commerce, and discrimination " 'simply means

differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " *United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Mgt. Auth.* (2007), 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655, quoting *Oregon Waste Sys., Inc. v. Dept. of Environmental Quality* (1994), 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13.

{¶ 46} States have an economic interest not only in "mom and pop" businesses, but in all forms of local investment. So it ignores economic reality to focus narrowly on the location of ownership or headquarters. While local ownership and headquarters *might* benefit the local economy, the amount of benefit depends on jobs and revenue. And a business need not be locally owned or headquartered to benefit the local economy. For instance, one fairly suspects that the city of Marysville, if forced to choose, would take the Honda plant over any homegrown business, and perhaps over any dozen.

{¶ 47} This is common sense, and numerous cases confirm it. Local investment, not simply locally headquartered businesses, may not be promoted through discriminatory taxation. See, e.g., *C & A Carbone, Inc. v. Clarkstown* (1994), 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 ("Discrimination against interstate commerce in favor of local business *or* investment is *per se* invalid * * *" [emphasis added]); *Lewis v. BT Invest. Managers, Inc.* (1980), 447 U.S. 27, 42, 100 S.Ct. 2009, 64 L.Ed.2d 702 (prohibited "local favoritism or protectionism" includes discrimination among businesses according to the extent of their contacts with the local economy or based on the extent of local operations); *Fulton Corp. v. Faulkner* (1996), 516 U.S. 325, 344, 116 S.Ct. 848, 133 L.Ed.2d 796 ("States may not impose discriminatory taxes on interstate commerce in the hopes of encouraging firms to do business within the State").

{¶ 48} Local investment, of course, includes the creation or preservation of local jobs. The Supreme Court has accordingly found "parochial legislation" to be constitutionally invalid when "the ultimate aim" of the legislation is "to

17

create jobs by keeping industry within the State." *Philadelphia v. New Jersey* (1978), 437 U.S. 617, 627, 98 S.Ct. 2531, 57 L.Ed.2d 475; see also *Baldwin v. G.A.F. Seelig, Inc.* (1935), 294 U.S. 511, 527, 55 S.Ct. 497, 79 L.Ed. 1032 (the power to tax may not be used to establish "an economic barrier against competition with the products of another state or the labor of its residents"); *South-Central Timber Dev., Inc. v. Wunnicke* (1984), 467 U.S. 82, 100, 104 S.Ct. 2237, 81 L.Ed.2d 71 ("the Commerce Clause forbids a State to require work to be done within the State for the purpose of promoting employment").

{¶ 49} Lower federal courts have recognized the same point. See, e.g., *Pelican Chapter, Associated Builders & Contrs., Inc. v. Edwards* (C.A.5, 1997), 128 F.3d 910, 918 ("patent economic protectionism" includes "[r]educing unemployment by discouraging the use of out-of-state labor"); *Louisiana Dairy Stabilization Bd. v. Dairy Fresh Corp.* (C.A.5, 1980), 631 F.2d 67, 70 (the Commerce Clause prevents a state from burdening interstate commerce for the purpose of "preventing local economic disruption"); *Mapco, Inc. v. Grunder* (N.D.Ohio 1979), 470 F.Supp. 401, 412 (Commerce Clause is violated by a differential tax on high- and low-sulfur coal that is intended to "protect and favor the Ohio high-sulfur coal industry (both workers and management)" and prevent "the likely loss of jobs of Ohio coal miners").

{¶ 50} Under these principles, the sales tax is unconstitutional. It treats sellers of the same service differently. That's discrimination. It favors the sellers who invest locally and burdens the sellers who do not. That's favoritism of in-state over out-of-state economic interests. Together, these features place the sales tax well within the prohibition of the dormant Commerce Clause.

### The Sixth Circuit Decision in *DIRECTV v. Treesh*
### Does Not Resolve This Case

{¶ 51} The majority follows the Sixth Circuit's statement in *DIRECTV, Inc. v. Treesh* (C.A.6, 2007), 487 F.3d 471, 481, that "the dormant Commerce

Clause is intended to protect interstate commerce, and not particular firms engaged in interstate commerce, or the modes of operation used by those firms." *Treesh* derived this rule from a pair of Supreme Court decisions, *Exxon Corp. v. Gov. of Maryland* (1978), 437 U.S. 117, 127, 98 S.Ct. 2207, 57 L.Ed.2d 91, and *Amerada Hess Corp. v. Dir., Div. of Taxation, New Jersey Dept. of Treasury* (1989), 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58. For several reasons, I am not persuaded that *Treesh* provides the answer to this case.

{¶ 52} First, *Treesh* is not on point. It reviewed a materially different tax structure. Kentucky had imposed an *even-handed* sales tax that treated cable and satellite the same way. There was no discrimination; without discrimination, there is no Commerce Clause claim. *Treesh* boiled down to whether a state *must* charge cable companies for use of rights-of-way, see 487 F.3d at 479, a much different question from the one presented here.

{¶ 53} Nevertheless, it is true that *Treesh* went on to suggest that under *Exxon* and *Amerada Hess,* the Commerce Clause does not prohibit differential taxation of the cable and satellite industries. I disagree that these cases save this tax.

### *Exxon* and *Amerada Hess* Do Not Immunize Discriminatory Taxes

{¶ 54} Neither *Exxon* nor *Amerada Hess* allows discriminatory taxation so long as both sides may be called "interstate firms" or use different "modes of operation." The plaintiffs in those cases lost because the court could discern no differential treatment of in-state and out-of-state interests.

{¶ 55} In *Amerada Hess*, the plaintiff oil companies alleged that the state tax favored independent retailers who do not produce oil over oil producers who market their own oil. 490 U.S. at 78, 109 S.Ct. 1617, 104 L.Ed.2d 58. But as the court pointed out, nonproducing retailers may operate both in the taxing state and outside it, and the tax treated *all* nonproducing retailers the same. Id. As the plaintiffs failed to identify a discrete, favored *state* interest, *Amerada Hess*

characterized the tax difference as resulting "solely from differences between the nature of [competing] businesses." Id. The key word is "solely," a word that cannot be used here.

{¶ 56} Similarly, in *Exxon*, the plaintiff oil companies alleged that the effect of a particular tax was to protect in-state independent dealers from out-of-state competition. 437 U.S. at 125, 98 S.Ct. 2207, 57 L.Ed.2d 91. But as the court pointed out, "there are several major interstate marketers of petroleum that own and operate their own retail gasoline stations," and "in-state independent dealers will have no competitive advantage over out-of-state dealers." Id. at 125–126. Thus, when *Exxon* stated that the Commerce Clause does not protect "the particular structure or methods of operation in a retail market," it had already concluded that the challenged tax was not discriminatory.

{¶ 57} Neither case involved an identifiable in-state, out-of-state line. So these cases stand for the modest proposition that the Commerce Clause permits states to distinguish among differing kinds of businesses, so long as the distinctions do not favor local economic interests. (Such distinctions could be challenged under the generally more lenient Equal Protection Clause.) But operational differences do not *immunize* protectionist discrimination—indeed, *Amerada Hess* and *Exxon* prove the point: despite clear operational differences in each case, the court still looked for location-based discrimination. It simply could not find it.

{¶ 58} "[N]o single conceptual approach identifies all of the factors that may bear on a particular case." *Raymond Motor Transp., Inc. v. Rice* (1978), 434 U.S. 429, 441, 98 S.Ct. 787, 54 L.Ed.2d 664. And more broadly, courts should "think things not words." *United States v. McGuire* (C.A.7, 2010), 627 F.3d 622, 624, 2010 WL 4908001, at *3. However selectively those cases may be quoted, *Exxon* and *Amerada Hess* have little bearing here.

**The Sales Tax Creates an Incentive to Invest in Ohio**

**{¶ 59}** The majority also suggests that the sales tax provides no incentive for the satellite companies to locate infrastructure in Ohio. This is not true.

**{¶ 60}** All other things being equal, the sales tax *does* give incentive to pay-TV companies to distribute signals using in-ground cable instead of satellites. Indeed, if the satellite companies installed an in-ground cable network, they would avoid the sales tax. Of course, given how much they have already invested in a different mode of delivery, that is an impossibly high price to pay.

**{¶ 61}** Following this point through, if the satellite companies did the unthinkable and installed an in-ground cable network, they would avoid the Ohio sales tax, and they would bring jobs, franchise fees, and property taxes to Ohio. This fact only confirms that favoring cable companies benefits in-state economic interests.

**Reversal Would Not Expand the Scope of the Dormant Commerce Clause**

**{¶ 62}** The majority does not address it, but the tax commissioner raises a form of the "floodgates" defense. He says that invalidating the sales tax would "create a nightmare for legislators and the courts to administer as no two interstate players have the same relative economic presence in each state in which they do business," and this presence "could literally change by the moment as one business elects to move its infrastructure around the country."

**{¶ 63}** The risk of deluge is overstated. This case could not recur without the following elements: (1) a materially identical good or service, (2) two competing industries offering the good or service using distinct methods or modes of delivery, (3) one method making heavy use of the state's land and labor, with the other virtually bypassing the state's economic infrastructure, (4) different tax treatment of the materially identical good or service, (5) favorable treatment of the local method over the nonlocal, (6) indications in the evolution of the tax that it was motivated by protectionism, and (7) no constitutionally valid explanation for the tax.

{¶ 64} I find it doubtful that such a fact pattern will often recur. The problem of comparing mismatched sets of "interstate players" is answered by the requirement that the favored and disfavored parties be similarly situated. See *Gen. Motors Corp. v. Tracy* (1997), 519 U.S. 278, 117 S.Ct. 811, 136 L.Ed.2d 761. That requirement—which is met here, as cable and satellite unquestionably compete—would head off most problems, including the tellingly short parade of horribles marched out by the tax commissioner. And if this fact pattern did recur, it is unobjectionable that the Commerce Clause would prohibit it.

### The Compensatory-Tax Defense Would Not Save This Tax

{¶ 65} The majority does not address the tax commissioner's affirmative defense, but for the sake of completeness, I will. A protectionist tax can be saved if "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach* (1988), 486 U.S. 269, 278, 108 S.Ct. 1803, 100 L.Ed.2d 302. The "standards for such justification are high," however, invoking " 'the strictest scrutiny.' " Id. at 278–279, quoting *Hughes v. Oklahoma* (1979), 441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250.

{¶ 66} The commissioner offers only one substantial nondiscriminatory justification: that the sales tax counterbalances the franchise fees that cable companies pay to local governments. This is the "compensatory tax" defense. See, e.g., *Fulton Corp.,* 516 U.S. at 331, 116 S.Ct. 848, 133 L.Ed.2d 796. Often raised, this defense rarely wins. All of the following cases have rejected it: *S. Cent. Bell Tel. Co. v. Alabama* (1999), 526 U.S. 160, 169–170, 119 S.Ct. 1180, 143 L.Ed.2d 258; *Fulton Corp.*, 516 U.S. at 331–344, 116 S.Ct. 848, 133 L.Ed.2d 796; *Associated Industries of Missouri v. Lohman* (1994), 511 U.S. 641, 648–649, 114 S.Ct. 1815, 128 L.Ed.2d 639; *Oregon Waste Sys.,* 511 U.S. at 104, 114 S.Ct. 1345, 128 L.Ed.2d 13; *Tyler Pipe Industries, Inc. v. Washington State Dept. of*

*Revenue* (1987), 483 U.S. 232, 244, 107 S.Ct. 2810, 97 L.Ed.2d 199; *Armco Inc. v. Hardesty* (1984), 467 U.S. 638, 642–643, 104 S.Ct. 2620, 81 L.Ed.2d 540; *Maryland v. Louisiana* (1981), 451 U.S. 725, 758, 101 S.Ct. 2114, 68 L.Ed.2d 576; *Boston Stock Exchange v. State Tax Comm.* (1977), 429 U.S. 318, 332, 97 S.Ct. 599, 50 L.Ed.2d 514. In the court's own words, since 1937, it has "shown extreme reluctance to recognize new compensatory categories" beyond the sales-and-use-tax combination. *Fulton Corp.*, 516 U.S. at 338.

**{¶ 67}** Even assuming that individually negotiated franchise fees in this case constitute "taxes," the compensatory-tax defense does not avail the tax commissioner. First, the sales tax and the franchise fees are not "substantially equivalent," that is, "sufficiently similar in substance to serve as mutually exclusive 'prox[ies]' for each other." *Oregon Waste Sys.*, 511 U.S. at 103, 114 S.Ct. 1345, 128 L.Ed.2d 13, quoting *Armco*, 467 U.S. at 643, 104 S.Ct. 2620, 81 L.Ed.2d 540. For the sales tax, the taxable event is a transaction, the sale of television programming. See, e.g., *Howell Air, Inc. v. Porterfield* (1970), 22 Ohio St.2d 32, 34, 51 O.O.2d 62, 257 N.E.2d 742. Franchise fees are not taxes on the privilege of purchasing, but compensate the local government for the costs incurred in allowing and regulating access to public rights of way.

**{¶ 68}** The real-world differences between the two industries confirm the legal conclusion that sales taxes and franchise fees cannot be equated. Cable must burden public property to deliver its signals—it must string cable on poles and bury it in the ground. Satellite does not impose these kinds of burdens, so requiring satellite companies to pay their proxy would not make sense.

**{¶ 69}** But whereas *only* cable engages in the activity that triggers franchise fees, *both* cable and satellite engage in the activity taxed by the sales tax—both sell television programming. Thus, sparing the cable industry the sales tax does not equalize the tax burden so much as it eliminates a cost advantage held by satellite—the ability to deliver service without using public rights-of-way.

**{¶ 70}** Finally, even if franchise fees were fairly comparable, the sales tax exceeds the amount of the franchise fee. See *Oregon Waste*, 511 U.S. at 103, 114 S.Ct. 1345, 128 L.Ed.2d 13. The sales tax is currently 5 1/2 percent. R.C. 5739.02(A)(1). Franchise fees are *capped* at five percent of gross receipts. Section 542(b), Title 47, U.S.Code. But some localities have agreed to less. For example, the city of Delaware has charged a fee as low as three percent. And whether through a later reduction of franchise fees or an increase of the sales tax, these disparities could increase.

**{¶ 71}** In sum, the sales tax treats competing industries differently, effectively (and perhaps intentionally) favoring the industry with extensive local ties over the one with comparatively few. Such a law violates the Commerce Clause. For these reasons, I respectfully dissent and would reverse the judgment of the court of appeals.

PFEIFER, J., concurs in the foregoing opinion.

_____

Orrick, Herrington & Sutcliff, L.L.P., E. Joshua Rosenkranz, and Jeremy N. Kudon; Steptoe & Johnson, L.L.P., Pantelis Michalopoulos, and Mark F. Horning; and Calfee, Halter & Griswold, L.L.P., and Peter A. Rosato, for appellants.

Richard Cordray, Attorney General, and Lawrence D. Pratt, Alan P. Schwepe, Julie E. Brigner, Damion M. Clifford, and Barton A. Hubbard, Assistant Attorneys General, for appellee.

David Parkhurst; and Vorys, Sater, Seymour & Pease, L.L.P., and Robert J. Krummen, urging affirmance for amicus curiae National Governors Association.

Sutherland, Asbill & Brennan, L.L.P., and Eric S. Tresh; Walter Hellerstein; and Vorys, Sater, Seymour & Pease, L.L.P., Douglas R. Matthews,

and Michael J. Hendershot, urging affirmance for amici curiae Time Warner Cable, ComCast, and Cox Communications.

John A. Swain and David C. Crago, urging affirmance for amicus curiae Ohio Cable Telecommunications Association.

Fleischman & Harding, L.L.P., Arthur H. Harding, Craig A. Gilley, and Micah M. Caldwell; and Ulmer & Berne, L.L.P., and Donald J. Mooney Jr., urging affirmance for amicus curiae Institute for Policy Innovation.

Roy Cooper, North Carolina Attorney General, Christopher G. Browning Jr., Solicitor General, Gary R. Govert, Special Deputy Attorney General, and Michael D. Youth, Assistant Attorney General; Mark L. Shurtleff, Utah Attorney General, and Annina M. Mitchell, Solicitor General, urging affirmance for amici curiae states of North Carolina, Utah, Delaware, Florida, Illinois, Kansas, Kentucky, Maryland, Michigan, Mississippi, Missouri, Rhode Island, Tennessee, Virginia, and West Virginia.

Shirley K. Sicilian and Sheldon H. Laskin, urging affirmance for amicus curiae Multistate Tax Commission.

Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., Marcus W. Trathen, Charles F. Marshall, and Julia C. Ambrose; and Kegler, Brown, Hill & Ritter, L.P.A., and Paul D. Ritter Jr., urging affirmance for amicus curiae National Conference of State Legislatures.

Jones Day, Douglas R. Cole, and Erik J. Clark, urging reversal for amicus curiae Constitutional Law Professors.

Hinman & Carmichael, L.L.P., and John A. Hinman, urging reversal for amicus curiae Specialty Wine Retailers Association.

Mark C. Ellison, urging reversal for amicus curiae National Rural Telecommunications Cooperative.

Chester, Willcox & Saxbe, L.L.P., Gerhardt A. Gosnell II, and Donald C. Brey, urging reversal for amicus curiae Satellite Broadcasting and

Communications Association, ACE Satellite, Buckeye Dish Installation, Inc., Cable Alternatives, Primeview Satellite, Kidwell Satellite, Richland County Satellite, Premiere Satellite & Electronics, Inc., Wells Family Equipment, Thobe TV, Felix Electronics, Vince's TV & Appliance, Digi-Tech Satellite, Dudley Satellites, George's Electronics, Inc., and Progressive Satellite.

_____