*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DIRECTV, INC. and ECHOSTAR SATELLITE L.L.C.,
  *Plaintiffs-Appellants,*

  *v.*

MARK TREESH, COMMISSIONER FOR THE DEPARTMENT OF REVENUE FOR THE STATE OF KENTUCKY,
  *Defendant-Appellee.*

No. 06-5523

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 05-00024—Karen K. Caldwell, District Judge.

Argued: January 23, 2007

Decided and Filed: May 31, 2007

Before: BOGGS, Chief Judge; and MERRITT and MOORE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Pantelis Michalopoulos, STEPTOE & JOHNSON, Washington, D.C., for Appellants. Douglas M. Dowell, OFFICE OF LEGAL SERVICES FOR REVENUE, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Pantelis Michalopoulos, Lincoln L. Davies, Mark F. Horning, STEPTOE & JOHNSON, Washington, D.C., Kenneth S. Handmaker, Bradley E. Cunningham, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellants. Douglas M. Dowell, Laura M. Ferguson, OFFICE OF LEGAL SERVICES FOR REVENUE, Frankfort, Kentucky, for Appellee. Burt A. Braverman, Timothy P. Tobin, COLE, RAYWID & BRAVERMAN, Washington, D.C., Jackson W. White, Lexington, Kentucky, for Amicus Curiae.

_____

## OPINION

_____

BOGGS, Chief Judge. Directv, Inc. and Echostar Satellite L.L.C., collectively "the satellite companies," appeal from the district court's dismissal of their claims against Mark Treesh, the Commissioner of the Department of Revenue for the state of Kentucky. The satellite companies seek a permanent injunction against certain provisions recently added to Kentucky's revenue statutes that afford cable television operators credits and other relief from state taxes assessed against both cable companies and the satellite companies. The satellite companies contend that these credits

1

unconstitutionally discriminate against interstate commerce in violation of the Commerce Clause of Article I of the Constitution. Because we find no constitutional violation, we affirm the judgment of the district court.

# I

## a. The Satellite and Cable Companies

The satellite companies provide multi-channel video programming to subscribers by means of satellites stationed above the Earth. The federal government auctioned the right to transmit on certain electromagnetic frequencies, and the satellite companies paid more than $700 million for these rights. The satellite companies allege that they have further invested more than $1 billion in building, insuring, and launching their satellites. Subscribers in Kentucky receive the signals from these satellites by means of small satellite dishes mounted on or near their houses. According to their complaint, the satellite companies "employ no infrastructure in the State to transmit their signal directly to the subscriber and do not use public rights-of-way in providing service." The district court noted, however, that according to the *amicus curiae* brief of the Kentucky Cable Television Association ("KCTA"), the satellite companies do have "local receiving facilities" on the ground in Kentucky, which receive the signals of local broadcast stations and include them in their offerings with the channels sent by satellite. In their complaint, the satellite companies state that Directv has two sales employees in Kentucky and that EchoStar has six sales employees in Kentucky. The district court noted that, according to the KCTA, the satellite companies employ a "legion" of local contractors in Kentucky to sell their services and receiving dishes.

Cable companies, on the other hand, provide multi-channel video programming by means of cable networks located in Kentucky. Cable systems receive the programming that they retransmit to subscribers at local cable headends. The cable headends then transmit the programming to Kentucky subscribers by way of cables laid in trenches in or along roads or hung on utility poles in the state and connected to the subscribers' television sets and set-top boxes. In their complaint, the satellite companies assert that cable companies must obtain local government permission to use roads and other rights-of-way in order to lay or string cable connecting their local distribution facilities to the subscribers' homes. Local governments typically provide this permission by franchise agreements and permits granted to the cable companies. The satellite companies assert that in return for permission to use public rights-of-way, the cable companies pay a franchise fee to the applicable local government that is typically five percent of gross revenue within the franchise area. The satellite companies characterize the franchise fee as "compensation to the local government for valuable rights granted by the franchise." The satellite companies allege that cable operators have a "strong local presence in Kentucky due to the employment of numerous Kentucky residents and the location of numerous offices and facilities within the state to provide service." Finally, the satellite companies allege that when a customer wishes to purchase a subscription to multi-channel television service, there are basically only two choices: cable or satellite.

## b. The Changes to Kentucky's Tax Law

In March 2005, Kentucky amended its tax laws. *See* 2005 Ky. Acts 168, Ky. H.B. No. 272, 2005 Regular Session (2005) (the "2005 amendments") (relevant provisions codified at various sections of Chapter 136 of the Kentucky Revised Statutes).

Prior to the 2005 Amendments, neither the cable companies nor the satellite companies were required to pay Kentucky state sales tax. In addition, pursuant to § 602(a) of the federal Telecommunications Act of 1996, the satellite companies, but not the cable companies, were and are exempt from all local taxes and fees. Pub. L. No. 104-104, Title VI, § 602(a), 110 Stat. 144(a)(1996) (reprinted at 47 U.S.C. § 152, historical and statutory notes). Nevertheless, the

Telecommunications Act explicitly reserves to states the powers the states themselves had to tax satellite companies. *Ibid.* Meanwhile, as stated above, the cable companies paid franchise fees to local governments.

The Kentucky legislature passed the 2005 Amendments in order to provide "a fair, efficient, and uniform method for taxing communications services sold" in Kentucky and to simplify "an existing system that includes a myriad of levies, fees, and rates imposed at all levels of government." KRS § 136.600(1), (3). The 2005 amendments became effective on January 1, 2006.

Section 90 of the 2005 Amendments imposes an excise tax on the retail purchase of multichannel video programming service provided to a person whose place of primary use is in the state. KRS § 136.604(1). The amendments define "multichannel video programming service" as "cable service and satellite broadcast and wireless cable service." *Id.* § 136.602(8). The excise tax is 3% of the sales price charged for the service. *Id.* § 136.604(2). Section 96 of the 2005 Amendments imposes a 2.4% tax on a multichannel video programming service provider's gross revenues from service provided to people in Kentucky. *Id.* § 136.616(1), (2)(a). Together, these provisions effectively impose a 5.4% tax on total charges for either cable or satellite.

Section 112 of the 2005 Amendments establishes a gross revenues and excise tax fund. KRS § 136.648(1). All revenues from the taxes described above are to be deposited into this fund. The money in the fund is then to be allocated among the state and its political subdivisions, school districts, and special districts. *Id.* § 136.648(3). Under Section 113 of the 2005 Amendments, every "political subdivision, school district, special district, and sheriff's department" must certify to the Revenue Cabinet the total local franchise fees it collected from multichannel video programming service providers in fiscal year 2005. *Id.* § 136.650(1). This certified amount is then used to determine the monthly portion of the gross revenues and excise tax fund that will be distributed to each subdivision, school district, and special district. The 2005 Amendments provide that each will be assigned a percentage, called the "local historical percentage," which is based on the amount of the subdivision's certified collections as a proportion of the total certified amount of all collections of all parties participating in the fund. In return for their participation in this fund, the subdivisions must agree to relinquish any right to a franchise fee or tax on multichannel video programming services. *Id.* § 136.650(1)(b).

Pursuant to Section 118 of the 2005 Amendments, local governments are prohibited from levying any franchise fee or tax on a multichannel video programming service. KRS § 136.660. If a local government imposes or attempts to impose a franchise fee or tax, the local government may not receive any share of the proceeds of the excise and gross revenues taxes for the period that the imposition occurs. *Id.* § 136.660(4). Further, if a provider of a multichannel video programming service actually pays a franchise fee or tax with respect to the service, the provider is entitled to a credit against the state taxes due in the amount of the franchise fee or tax. *Id.* § 136.660(5).

### c. The Satellite Companies' Complaint

The satellite companies allege that the provisions of the 2005 Amendments that "afford cable system operators credits against the state excise and gross revenues taxes and relief from franchise fees unconstitutionally discriminate against interstate commerce in violation of the Commerce Clause." The satellite companies ask the court to declare KRS § 136.660(4), (5) unconstitutional. These are the subsections of the 2005 Amendments prohibiting local governments from levying franchise fees and taxes, denying local governments fund proceeds if they levy such fees, and crediting providers of multichannel video programming services for any such fees paid. In effect, they argue that if a state imposes uniform taxes on all multi-channel video programming providers, it also is constitutionally required that the state allow its localities and subdivisions to charge significant franchise fees.

The satellite companies argue that with the new provisions the cable companies receive a tax preference because revenues from the state excise and gross revenues tax are used to pay the franchise fees that cable operators would otherwise have to pay local governments for access to local rights-of-way. This discriminates against interstate commerce because cable companies, which provide service via infrastructure necessarily located within the state, get the tax preference while satellite companies, which provide service via satellites inherently located outside of the state, get no tax preference. In other words, the cable companies pay the new taxes but get relief from a portion of their operating costs, i.e., the price paid for the right to provide cable service in the franchise area and rights of access to public rights-of-way. The satellite companies pay the new taxes, but receive no relief from their operating costs. According to the satellite companies, this constitutes discrimination against interstate commerce because the burdened entities – the satellite companies – employ inherently out-of-state facilities and have very little in-state infrastructure, while the benefitted entities – the cable companies – employ necessarily expansive in-state facilities to deliver their television service.

## II

We review a grant of a Rule 12(b)(6) motion to dismiss *de novo*. *See, e.g.*, *Golden v. City of Columbus*, 404 F.3d 950, 958 (6th Cir.), *cert. denied*, 126 S. Ct. 738 (2005). "[A] Rule 12(b)(6) motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ricco v. Potter*, 377 F.3d 599, 602 (6th Cir. 2004) (quotation omitted). In reviewing a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff. *See Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 228 (6th Cir. 2005). The defendant has the burden of showing that the plaintiff has failed to state a claim for relief. *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991). While all the factual allegations of the complaint are accepted as true, "we need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000) (citation omitted).

## III

The satellite companies first argue that the district court erred by relying on factual assumptions that were neither alleged in their complaint nor consistent with the complaint's allegations. The satellite companies argue that this improperly converted the motion to dismiss into a motion for summary judgment. Specifically, the satellite companies argue that the district court substituted its own factual assumptions, largely drawn from the KCTA *amicus* brief, for the factual allegations in the satellite companies' complaint, and that the district court faulted plaintiffs for not coming forward with evidence to support their allegations.

At some times in its opinion, the district court appears to have made factual assumptions that may be controverted. While the satellite companies alleged that they used no infrastructure whatsoever within the state to deliver programming, the district court found that "the mechanisms by which the . . . Satellite Companies deliver programming lie partially outside of Kentucky and partially inside the state." The district court specifically pointed to the receiving dishes for local programming mentioned in the KCTA brief as an example of the in-state infrastructure. Further, the district court faults the satellite companies for the lack of "evidence in the record" to support the principal places of business of the satellite and cable companies, and the failure of the satellite companies to "presen[t] any other evidence" from which the district court could conclude that cable companies are in-state economic interests.

If the district court's decision were actually predicated upon the above factual findings or the failure of plaintiffs to present the specified evidence, it would have been error. "[U]nder the notice pleading standard of the Federal Rules, courts are reluctant to dismiss colorable claims which

have not had the benefit of factual discovery." *Evans-Marshall*, 428 F.3d at 228. Further, it does not appear that the satellite companies were given a "reasonable opportunity to present all material made pertinent to the issue" as required by Fed. R. Civ. P. 12(b) when a district court converts a motion to dismiss into a motion for summary judgment.

The district court's opinion, however, was not clearly predicated upon its additional factual findings or its finding of lack of evidence. Several of the district court's reasons for dismissal were not based on these additional findings. Therefore, ignoring the above flaws in the district court's opinion, the relevant question on appeal is whether the district court properly found that, even accepting all of the facts in the satellite companies' complaint as true, the complaint failed to demonstrate that the 2005 Amendments discriminate against interstate commerce.

## IV

The Constitution expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3, and the "negative" or "dormant" aspect of the Commerce Clause implicitly limits a state's right to tax interstate commerce. In *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318 (1977), the Court provided a concise exegesis of the dormant aspect of the Commerce Clause:

> [W]e begin with the principle that "[the] very purpose of the Commerce Clause was to create an area of free trade among the several States." *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330 (1944). It is now established beyond dispute that "the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States . . . [T]he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States." *Freeman v. Hewit*, 329 U.S. 249, 252 (1946). The Commerce Clause does not, however, eclipse the reserved "power of the States to tax for the support of their own governments," *Gibbons v. Ogden*, 9 Wheat. 1, 199 (1824), or for other purposes . . . rather, the Clause is a limit on state power. Defining that limit has been the continuing task of this Court. On various occasions when called upon to make the delicate adjustment between the national interest in free and open trade and the legitimate interest of the individual States in exercising their taxing powers, the Court has counseled that the result turns on the unique characteristics of the statute at issue and the particular circumstances in each case. *E.g.*, *Freeman v. Hewit* . . . . This case-by-case approach has left "much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation." *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 457 (1959).

*Id.* at 328-29.

A tax provision satisfies the requirements of the Commerce Clause if (1) the activity taxed has a substantial nexus with the taxing state; (2) the tax is fairly apportioned to reflect the degree of activity that occurs within the state; (3) the tax does not discriminate against interstate commerce; and (4) the tax is fairly related to benefits provided by the state. *See Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977). The satellite companies only challenge Kentucky's amended tax law on ground (3).

The Commerce Clause "does not prevent the States from structuring their tax systems to encourage the growth and development of intrastate commerce and industry." *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 336-37 (1977). The Supreme Court has never precisely

delineated the scope of the doctrine that bars discriminatory taxes. The Court has made it clear, however, that a tax statute's "constitutionality does not depend upon whether one focuses upon the benefitted or the burdened party." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 273 (1984).

In general, a challenged credit or exemption will fail Commerce Clause scrutiny if it discriminates on its face, or if, on the basis of a "sensitive, case-by-case analysis of purposes and effects," the provision "will in its practical operation work discrimination against interstate commerce," *West Lynn Creamery v. Healy*, 512 U.S. 186, 201 (1994) (citations omitted), by "providing a direct commercial advantage to local business." *Bacchus Imports*, 468 U.S. at 268 (citations omitted). "'Discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994). A state tax provision that discriminates against interstate commerce is invalid unless "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* at 101 (citation omitted).

A statute found to discriminate against interstate commerce "is virtually *per se* invalid." *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996) (citation omitted). Once discrimination is shown, the heavy burden to prove the law's validity falls on the state. *See Maine v. Taylor*, 477 U.S. 131, 138 (1986).

On appeal, the satellite companies argue solely that the 2005 Amendments discriminate against interstate commerce in practical effect. *West Lynn Creamery*, 512 U.S. at 201. The satellite companies complain that what they call the "tax and subsidy" approach, taken by Kentucky in the 2005 Amendments, is a sham. According to the satellite companies, while the Amendments purport to prohibit franchise fees from being assessed against all multi-channel broadcast services, in fact, only cable companies have been required to pay local franchise fees. Therefore, only they will benefit from this provision, while the satellite companies garner no benefit.

As an initial matter, the satellite companies do not contend that if Kentucky had solely imposed an equal state tax on both satellite companies and cable companies, without providing a credit for the cable companies' franchise fees or banning those fees, that such a tax would violate the Commerce Clause. Nor does it appear that Kentucky would have violated the Commerce Clause had it solely banned local governments from imposing franchise fees on cable companies. The nature of the franchise fees are somewhat disputed. As this case is before us on a motion to dismiss, we will accept the contention of the satellite companies that these franchise fees are at least compensatory in part; that they are collected in order to compensate the local governments for the cable companies' use of the rights-of-way, utility poles, etc. However, there is no allegation of any significant cost to the city of providing this access to the cable companies.

States and local government are under no mandate to charge for the use of local rights-of-way; this is readily apparent from the fact that not every road is a toll road. States have wide latitude "to encourage the growth and development of intrastate commerce and industry." *Boston Stock Exch.*, 429 U.S. at 336-37. The provision of access to the state infrastructure free of charge is an acceptable option that the state may exercise.[1] While the Supreme Court has struck down state regulations that charged out-of-state truckers and in-state truckers the same flat fees for the use of the state highways because the in-state truckers use the highways more frequently, *American Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 282 (1987), there is no indication that states would violate the Commerce Clause by foregoing such fees entirely, even though the lack of such a fee would benefit local truckers more than out-of-state truckers. *See West Lynn Creamery*, 512 U.S. at

---

[1]The Court has indicated that even direct monetary subsidies to in-state companies often will not violate the Commerce Clause. *See West Lynn Creamery*, 512 U.S. at 199 n.15.

199 n.15 ("[I]t is undisputed that States may try to attract business by creating an environment conducive to economic activity, as by maintaining good roads . . . ." (citing *Zobel v. Williams*, 457 U.S. 55, 67 (1982) (Brennan, J., concurring))).

Yet, as the Court has recognized in *West Lynn Creamery*, a tax and a subsidy, each of which would be constitutional standing alone, might together be unconstitutional. 512 U.S. at 199-200. The satellite companies analogize Kentucky's new taxation regime to the one found to violate the dormant Commerce Clause in *West Lynn Creamery*. In that case, Massachusetts required all milk dealers in the state to contribute to a price equalization fund regardless of whether they bought milk from in-state or out-of-state producers. The state then distributed the proceeds of that fund solely to Massachusetts dairy producers, but not to their out-of-state counterparts. The court found that this violated the Commerce Clause: "Although the tax also applies to milk produced in Massachusetts, its effect on Massachusetts producers is entirely . . . offset by the subsidy provided exclusively to Massachusetts dairy farmers." *West Lynn Creamery*, 512 U.S. at 194. Massachusetts argued that either the tax or the subsidy standing alone would be constitutional, therefore, the combination must be constitutional as well. The Court rejected that contention, concluding that, even assuming that each component would be constitutional standing alone, "[b]y conjoining a tax and a subsidy, Massachusetts has created a program more dangerous to interstate commerce than either part alone." *Id.* at 199-200.

The instant case differs from *West Lynn Creamery* in several important respects. First, the claimed subsidy is not a direct monetary subsidy, but is instead only the right to conduct business and use local rights-of-way without local taxation or fees. Second, in *West Lynn Creamery*, the "purpose and effect" of the tax and subsidy was "to divert market share" from an out-of-state good to an identical in-state good. *Id.* at 203. In this case, however, the two "goods" are distinct, consisting of two very different means of delivering broadcasts. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (holding that the Commerce Clause does not "protect[] the particular structure or methods of operation in a retail market."). Further, the purposes of the 2005 Amendments include non-market share related goals, such as simplifying the labyrinthine system of fees cable companies currently face and collecting taxes from the previously untaxed, burgeoning satellite industry.

The "paradigmatic example" of a law that violates the dormant Commerce Clause is the protective tariff, which taxes goods produced in other states but not those produced in-state. *West Lynn Creamery*, 512 U.S. at 193. Such tariffs are so clearly unconstitutional that states hardly ever enact them. *Ibid.* Yet other measures are the functional equivalent of such tariffs, such as enacting a facially neutral tax on all liquor and exempting liquor produced locally from the tax. *Bacchus Imports*, 468 U.S. at 263. In *West Lynn Creamery*, the Court found a tariff disguised as a tax and subsidy. The purpose and effect of that scheme was solely to raise the price of out-of-state milk and lower the price of in-state milk.

The satellite companies' allegations are insufficient to demonstrate that the 2005 Amendments create the functional equivalent of a protective tariff. With the Amendments, the state has simply prevented localities from mulcting cable companies through franchise fees, and substituted a uniform state taxation scheme. It has not otherwise altered any competitive balance among in and out-of-state competitors.

Further, a protective tariff is so clearly problematic because its only possible purpose is to benefit in-state interests at the expense of out-of-state interests – likewise an industry-specific tax and subsidy scheme. *See Note: Functional Analysis, Subsidies, and the Dormant Commerce Clause*, 110 Harv. L. Rev. 1537, 1552-54 (1997). Unlike a protective tariff, however, the purposes of Kentucky's 2005 Amendments are much more diffuse. While *a* purpose of the Amendments might have been to aid the cable industry rather than the satellite industry because the former has a larger

in-state presence than the latter, there were clearly *many other* purposes including assessing some tax against a satellite industry that is rapidly growing, and simplifying the current morass of local taxes and franchise fees that cable companies face. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976) (upholding a state policy clearly motivated in part by a desire to improve the state's environment, despite any concurrent protectionist motivations). The satellite companies' opinion of the 2005 Amendments might be very different had they been subjected to the tangled regime of local taxation and franchise fees, as they certainly could have been absent the special exemption granted to them by the Telecommunications Act. 47 U.S.C. § 152, historical and statutory notes. Beyond that, because satellite and cable television differ significantly in their means of operation, Kentucky may have wished to remove any barriers it had put in place to the continued viability of cable for reasons entirely unrelated to geography – for example, that cable providers often provide internet access as well, that cable providers are more likely to provide public access channels, etc. None of these reasons are explicitly given by Kentucky in support of the Amendments, but the possibility that they in some way motivated the Kentucky legislature's actions is the reason that the Supreme Court has held that the dormant Commerce Clause is intended to protect interstate commerce, and not particular firms engaged in interstate commerce, or the modes of operation used by those firms. *Exxon Corp.*, 437 U.S. at 126-28; *see also Amerada Hess Corp. v. Director, Div. of Taxation, N. J. Dep't of the Treasury*, 490 U.S. 66, 78 (1989) (holding that the differential tax treatment of "two categories of companies result[ing] solely from differences between the nature of their businesses, [and] not from the location of their activities" does not violate the dormant Commerce Clause.).

We must be cautious about applying the dormant Commerce Clause in cases that do not present the equivalent of a protective tariff. States must be allowed, and even encouraged, to work "to attract business by creating an environment conducive to economic activity." Applying the dormant Commerce Clause to invalidate Kentucky's revenue statute in this case would dramatically increase the clause's scope and limit states' "right to experiment with different incentives to business," *Alexandria Scrap*, 426 U.S. at 817 (Stevens, J., concurring), or to implement "effective and creative programs for solving local problems." *Reeves*, 447 U.S. at 441. Kentucky's banning of local franchise fees can serve many purposes and have many effects other than arguably reducing a cost previously borne by one type of competitor in the marketplace. After a "sensitive . . . analysis of [the] purposes and effects" of the 2005 Amendments, we are unable to find that such action "will in . . . practical operation work discrimination against interstate commerce." *West Lynn Creamery*, 512 U.S. at 201.[2]

## V

Accordingly, for the reasons set out above, we AFFIRM the district court's grant of Treesh's motion to dismiss.

---

[2]Upon appeal, Treesh argues that Congress explicitly approved the type of taxation that Kentucky implemented with the 2005 Amendments. *See* 47 U.S.C. § 152, historical and statutory notes. Congress may authorize state regulation that would otherwise violate the dormant Commerce Clause. *Quill Corp. v. North Dakota*, 504 U.S. 298, 318 (1992). Because we affirm the district court's judgment on other grounds, it is unnecessary for us to decide this question.