Billings, Thomas P., J.
In this action the plaintiffs, DIRECTV, LLC and DISH NETWORK. L.L.C. challenge the constitutionality of G.L.c. 64M, §1 et seq., the so-called “satellite tax,” as violating the Commerce Clause of the United States Constitution and the Equal Protection Clauses of the United States and Massachusetts Constitutions. Now before the Court are cross motions for summary judgment, and the defendant’s motion to strike certain statements of material fact. Both sides agree—as, on the record before me, do I—that the issues can be decided as a matter of law.
*49 For the following reasons, the plaintiffs motion for summary judgment is DENIED; the defendant’s motion for summary judgment is ALLOWED; and the defendant’s motion to strike is DENIED as moot.
BACKGROUND
The record reveals the following facts, which are largely undisputed. Pay television (“pay-TV”), or multichannel video programming, provides the subscriber with multiple shows, movies, sporting events, news channels, and more. Massachusetts residents wishing to subscribe to pay-TV typically have two options. They can order their service from a cable provider that assembles its programming packages in Massachusetts and distributes them through a local cable infrastructure (“cable TV”).[1] As an alternative, they can order the service through a provider that assembles its programming packages outside Massachusetts and beams its signals directly to subscribers’ homes by way of orbiting satellites (“satellite TV”).
Plaintiff DIRECTV is a limited liability company headquartered in El Segundo, California. Plaintiff DISH is a limited liability company headquartered in Englewood, California. Both plaintiffs offer pay-TV programming to customers in Massachusetts and throughout the United States via satellite. Satellite TV uses uplink centers to gather, merge, and encrypt television programming signals. DIRECTV’S uplink centers are in Cheyenne, Wyoming, and Gilbert, Arizona; DISH’s are near Castle Rock, Colorado, and Los Angeles, California. Each uplink center has its own “farm” of satellite dishes, studio equipment, and staff of trained employees. At the uplink centers, content signals are gathered, local advertising is inserted, and the programming packaged.
Satellite TV programming signals are then transmitted from the uplink centers to satellites that reside in geostationaiy orbit 22,300 miles above the Earth’s atmosphere. From these satellites in space, the programming signals are transmitted directly to satellite TV customers, who receive the signals by way of a receiving dish mounted on or located near their homes. To gather local TV signals—that is, those from local broadcast stations such as WBZ or WHDH—the plaintiffs maintain local collection facilities in Massachusetts. These local collection facilities typically consist of a single room or closet containing receivers and antennas that gather content from local broadcast stations, and transmit that content via fiber-optic cables leased from telecommunications service providers in Massachusetts to their uplink centers west of the Mississippi. The fiber-optic cables that the plaintiffs lease for this purpose are also used by other persons transmitting data at the same time.
During the time frame at issue in this case, January 1, 2006 through December 31, 2010, DIRECTV had local collection facilities in four Massachusetts cities; DISH had them in three Massachusetts cities. These local collection facilities are maintained by DIRECTV or DISH employees and/or by independent contractors. Because they lypically consist of only a small room or closet, they are not staffed on a daily basis.
Both plaintiffs use authorized local retailers to sell their products and services to Massachusetts subscribers. They also sell products and services at the Massachusetts stores of national retailers, such as Best Buy, Sears, BJ’s Wholesale Club, and Kmart, with whom they have distribution agreements.[2] From January 1, 2007 through July 1, 2009, DIRECTV contracted with Halstead Communications and Multi-band Corporation, each of which has employees in Massachusetts, for installation, maintenance, and/or repair services for those DIRECTV subscribers in Massachusetts. DISH contracted with Prime Service Center, which has employees in Massachusetts, for similar services during the same period.
DISH also used its subsidiary, DISH Network Services, LLC, for installation, maintenance and repair. DISH Network Services had 176 employees in Massachusetts in 2006, 207 in 2007, 188 in 2008, 178 in 2009, and 141 in 2010. From January 1, 2006, through December 31, 2010, DISH Network Services leased facilities in Massachusetts, which it used to store office equipment and vehicles used for installation and repair. For that period, both plaintiffs paid a yearly personal property tax in Massachusetts.
The plaintiffs spend millions of dollars annually on assembly and distribution, largely on satellites located in outer space and at their uplink centers. They also pay for the right to locate their satellites in outer space and transmit their signals through the air using certain frequencies. These fees are paid to the federal government, not to Massachusetts or its local governments.
Cable TV providers, by contrast, use ground-based facilities, thousands of miles of cable, and thousands of Massachusetts-based employees to distribute their programming. All such programming must pass through terrestrial distribution points in Massachusetts called “headend” facilities, typically buildings of between 3000 and 4000 square feet.[3] Large satellite dishes, usually between five and seven feet in diameter and located outside the headend buildings, gather the cable programming signals from the airwaves and transmit them to hundreds of receivers located inside the buildings. Once inside the buildings, these signals are modulated, local advertising is inserted, and the cable programming is assembled into different packages.
Those packages are then distributed to cable TV subscribers through thousands of miles of fiber-optic and/or coaxial cable that is laid in trenches or hung from utility poles.[4] The signals travel through “trunk” lines located several feet underground and then distributed through “hubs” and “nodes” into “feeder” lines. Hubs and nodes are physical buildings or cabinet devices that are maintained on a neighborhood- *50 by-neighborhood basis. Ultimately, cable TV signals reach each subscriber’s home through a “drop” line running from the feeder line. This network of cables, hubs, nodes, and trunk, feeder, and drop lines are all located, under or above ground, in Massachusetts.
Technologies and physical facilities aside, there is no dispute that both satellite TV and cable TV operate in a similar manner and provide pay-TV service in a similar way. Both offer a variety of programming packages. Both offer local broadcast stations. Both offer basic cable channels, such as CNN, ESPN and C-SPAN. Both offer premium cable channels such as HBO and Showtime. Both offer pay-per-view movies and events. Both offer on-demand programming services. Both offer music channel services. Both secure rights to distribute original programming from content providers. Both advertise their services through the internet, television, direct mail, newspaper circulars, and billboards.
Additionally,-both cable TV and satellite TV use call centers to respond to new customers and existing customer inquiries. Both lease equipment to subscribers, such as set-up boxes and digital recording devices. Both use employees and independent contractors for installation, maintenance, and repair. Both pay Massachusetts taxes on their personal property located within the Commonwealth, such as the set-up boxes and DVR devices. They pay corporate income taxes to Massachusetts, and collect and remit sales taxes on qualifying sale-purchase transactions in Massachusetts. Both designate a certain percentage of their channel capacity to public access, educational and government programming. The parties do not dispute that the services are virtually identical, and that customers view them as similar and substitutable. They agree that the typical Massachusetts customer selects a service based on price, customer service, reception qualify, and the breadth and types of programming offered.
The major players on both sides of the controversy are large interstate enterprises: DIRECTV is a corporation chartered in California and headquartered in Segundo; DISH is chartered in Colorado and headquartered in Englewood; Comcast is a Delaware corporation whose principal place of business is in Pennsylvania, and (as of 12/31/09) operated cable systems in 39 states; and Charter Communications is a Delaware corporation, headquartered in Missouri, and operates in 27 states.[5]
The major difference, and for the purposes of these motions the only relevant difference, between satellite TV and cable TV is the method by which the signals are assembled and distributed to customers. The former uses satellites located in outer space; the latter uses headends and an extensive web of ground-based equipment and cables all located in Massachusetts. The parties do not dispute that these different assembly and distribution systems translate into substantially different economic footprints in Massachusetts. From 2006 to 2010, Massachusetts major cable companies spent more than $1.66 billion on capital improvements, $303.3 million in 2010 alone, including investments in headend facilities, cable network, vehicles, and customer equipment. In 2010, major Massachusetts cable companies employed almost 5000 people in the Commonwealth, with a combined payroll of $357 million. The household spending of these employees contributed an additional $274.4 million in economic activity and supported more than 1,800 additional jobs in other industries in Massachusetts.
The different assembly and distribution systems also translate into different revenue streams for local governments. To place cables under or above ground, and to provide cable services to customers in a particular locality, cable companies must secure permission from local governments, in exchange for which they pay franchise fees to those municipalities in which they operate. The typical franchise fee is 3-5% of gross revenue from sales to subscribers within any given area. In 2010 this resulted in more than $63.3 million in revenue for cities and towns in Massachusetts. In addition to the fees, the typical, non-exclusive, franchise agreement requires that the cable TV provider meet certain obligations, including: meeting service quality and customer service standards; setting aside channels for public, educational, and governmental channels; providing services, facilities, and equipment to localities to support those channels; and providing free service to municipal buildings, schools, and libraries. Massachusetts municipalities also impose an average charge of 1.09% above the franchise fee for the financial support of public, educational, and government programming.
Satellite TV, on the other hand, hires far fewer employees; does not invest billions of dollars to build, service, or maintain facilities in Massachusetts; does not bargain for rights-of-way or pay franchise fees to local governments; and has no obligations to the local municipality similar to those of cable TV. While satellite TV providers still spend millions annually on employment, assembly, and distribution, that money is spent primarily at the providers’ uplink centers, all located outside Massachusetts. The plaintiffs do hire independent contractors in Massachusetts to maintain their collection facilities and for installation, maintenance, and repair of their equipment.
The New England Cable & Telecommunications Association (“NECTA”) is a regional trade association that represents the interests of substantially all the private cable companies in Massachusetts. Beginning in 2008, NECTA started lobbying for the imposition of an excise tax on satellite TV providers to achieve tax parity with cable TV companies. NECTA representatives inundated legislators with written materials and in-person meetings, and NECTA’s president, Paul Cianelli, made statements to the press and the public *51 to the effect that the satellite TV providers enjoyed a special tax exemption. In early June 2009, NECTA created a website designed to engender support for the tax. Comcast joined NECTA’s campaign.
The thrust of NECTA’s argument was that cable companies paid franchise fees, while satellite did not, and that cable also paid substantially greater real and personal property taxes to local government than satellite; there was therefore what cable repeatedly called a “tax parity” issue.[6] Some of the communications also mentioned the cable companies had a large real estate footprint and employed thousands locally, see supra, whereas the satellite companies had almost no real estate in Massachusetts and far fewer local employees.
On or about January 14, 2009, Senator Michael Morrissey filed Senate Bill 1314, which initially proposed a 5% excise tax on both cable and satellite providers, but allowed cable companies to offset the tax with a credit for property taxes and franchise fees. Cianelli drafted the language for Senate Bill 1314, with the help of NECTA’s outside counsel. At a hearing before the Joint Committee on Revenue on April 9, 2009, Cianelli proposed an amendment that would impose the 5% tax only on satellite companies, not on cable companies. A representative from the Satellite Broadcasting and Communications Association testified in opposition. Senate Bill 1314 was never voted out of the Committee.
Earlier, in July 2008, the Legislature had authorized the formation of the Special Committee on Municipal Relief as a joint bipartisan effort of the Senate and the House of Representatives to promote fiscal stability in the Commonwealth. NECTA lobbied members of the Special Committee to recommend the excise tax on their report to the Legislature. The Special Committee held a public hearing on December 3, 2008.
On May 8, 2009, the Special Committee released a report with recommendations, as well as draft legislation, that would impose a 5% excise tax on both cable and satellite TV providers, and allowed a credit for cable TV companies for franchise fees. Lobbyists for NECTA and Comcast then campaigned to change the language of the proposed excise tax so that it applied only to satellite TV providers. On May 21, 2009, the Senate passed an amendment to the House Bill making appropriations for fiscal year 2010 that imposed an excise tax of five percent of gross revenues of satellite TV providers, but not cable TV providers.
Members of the Committee of Conference finalized the details and submitted the appropriations bill, HB 4129, to a vote by the House and Senate. HB 4129 included the 5% excise tax on satellite TV. The Legislature passed the bill on June 19, 2009, and Governor Patrick signed the FY 2010 General Appropriation Act, St. 2007, c. 27, into law on June 29, 2009, with the satellite tax as one of many outside sections. See id., §61 (“FY 2010 Appropriations Act”). The tax was codified as G.L.c. 64M, Taxation of Direct Broadcast Satellite Service.[7] Between August 2, 2009, and November 30, 2010, it generated approximately $16,972,698 in revenue for the Commonwealth.
The plaintiffs filed their Amended Complaint in this case on April 1, 2011, seeking a declaratory judgment to the effect that G.L.c. 64M, §1 ef seq. violates the Commerce Clause of the United States Constitution (Count I); the Equal Protection Clause of the United States Constitution (Count II); and the Equal Protection Clause of the Massachusetts Constitution (Count II). The gist of their Commerce Clause argument is that the imposition of the tax has a discriminatory effect in that it protects and enhances the Massachusetts economy at the expense of interstate competition. They further argue that the Legislature enacted the excise tax with a discriminatory purpose; that is, to reward cable TV providers for their local economic activities and to penalize satellite TV providers for failing to invest and operate in the Commonwealth. The tax, the plaintiffs contend, confers an unfair advantage on cable companies and a competitive disadvantage on satellite companies, and is excessive in relation to the local benefits bestowed by the cable providers.
With respect to their equal protection claims, the plaintiffs take the position that the satellite-only tax serves no legitimate public purpose and that there is no rational basis for discrimination between satellite TV and cable TV. The only purpose of the differential treatment, according to the plaintiffs, is to serve the parochial economic interests of local cable companies and government entities. They seek, in addition to a declaratory judgment, a permanent injunction against the enforcement of the statute and a refund of taxes already paid.
Defendant Department of Revenue (“Department”) first responds that there is no violation of the Commerce Clause where satellite TV and cable TV are not similarly situated. In that respect, the Department points out that the two sectors have different technologies, equipment, regulatory responsibilities, and fiscal obligations to local government. That satellite TV and cable TV are not similarly situated, the Department argues, disposes of the plaintiffs’ claim of unlawful discrimination against interstate commerce. Furthermore, the Department contends that the plaintiffs have failed to adduce sufficient evidence that the Legislature purposefully discriminated against satellite TV, where the clear purpose of the act was revenue generation at a time of fiscal constraint, not economic protectionism. As to the plaintiffs’ equal protection claim, the Department asserts that the tax statute has a fair and rational relationship to the Legislature’s efforts to raise state and local revenue. Finally, the Department argues that there can be no refunds absent a request brought before the Appellate Tax Board through the statutory abatement process.
*52 DISCUSSION
Summary judgment is appropriate where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). ‘The moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). When parties file cross motions for summary judgment, the court adopts what has been described as a “Janus-like” dual perspective to view the facts for purposes of each motion through the lens most favorable to the nonmoving party. Allstate Ins. Co. v. Occidental Int’l, Inc., 140 F.3d 1, 2 (1st Cir. 1998). Each of the moving parties bears the burden of affirmatively demonstrating the absence of a triable issue as to its respective claim. Lev v. Beverly Enterprises-Massachusetts, Inc., 457 Mass. 234, 237 (2010).
1. The Commerce Clause
Article 1, §8, cl. 3 of the United States Constitution expressly authorizes Congress to regulate commerce among the states. The Commerce Clause is more than an affirmative grant of power, however; it also has a “negative sweep,” known as the “dormant” or “negative” Commerce Clause, by which “[a] State is . . . precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States.”[8] Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 278 n.7 (1977).
“The paradigmatic example of a law discriminating against interstate commerce is the protective tariff or customs duty, which taxes goods imported from other States, but does not tax similar products produced in State.” West Lynn Creamery v. Healy, 512 U.S. 186, 193 (1997). The dormant Commerce Clause sweeps more broadly than this, however, and generally
prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors . . . Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down . . . unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.
Id. at 192 (invalidating order by Massachusetts Department of Agriculture imposing monetary assessment on fluid milk, two-thirds of which was produced out of state, and distributing the proceeds to Massachusetts dairy farmers).
A dormant commerce clause challenge requires “a sensitive, case-by-case analysis of the purposes and effects” of a regulatory measure “to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce.” Id. at 201 (citation omitted). Discrimination “simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.” Oregon Waste Sys. v. Department of Envtl. Quality, 511 U.S. 93, 99 (1994) (striking down surcharge for disposal of solid waste generated out of state).
A statute may discriminate against out-of-state interests in any of three ways: (1) it may be discriminatory on its face; (2) it may have a discriminatory effect; or (3) it may have a discriminatory intent.[9] See Amerada Hess Corp. v. Director, Division of Taxation, New Jersey Dep’t of the Treasury, 490 U.S. 66, 75 (1989) .-The burden of establishing unlawful discrimination is upon the party challenging the validity of the statute. Lenscrafters, Inc. v. Robinson, 403 F.3d 798, 803 (6th Cir. 2005). A law that discriminates in favor of in-state business and against its out-of-state, but otherwise similarly situated, competition is “virtually per se invalid,” and will survive only if it “advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.” Kentudcy Dept, of Rev. v. Davis, 553 U.S. 328, 338 (2008) (upholding state income tax exemption for interest earned on municipal bonds of in-state, but not out-of-state, issuers). “Absent discrimination for the forbidden purpose, however, ‘the law will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.’ ” Id. at 338-39 (citation omitted).
The purpose of the commerce clause is not to relieve those engaged in interstate commerce from their just share of the state tax burden, even though it increases the cost of doing business. See, e.g., Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254 (1938). Nor are states prohibited from “structuring their tax systems” in a nondiscriminatory manner “to encourage the growth and development of intrastate commerce and industiy.” Boston Stock Exchange v. State Tax Comm’n, 429 U.S. 318, 336-37 (1977) (sustaining challenge to New York law imposing a greater tax burden on out-of-state securities sales than sales conducted within New York); see also West Lynn Creamery, 512 U.S. at 199 n.15 (“it is undisputed that States may try to attract business by creating an environment conducive to economic activfly’j.
In this case, the satellite providers maintain that the Satellite Service Tax discriminates against interstate commerce in both effect and purpose.
A. Discriminatory Effect
“Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities.” General Motors Corp. v. Tracy, 519 U.S. 278, 299 (1997) [“Tracy”). The threshold question in making a determination as to discrimination, therefore, is “whether the companies are indeed similarly situated for constitutional purposes.” Id.; see Lenscrafters, 403 *53 F.3d at 804. The plaintiffs argue that, because they operate in the same market as cable TV providers, and are thus competitors, they are similarly situated for constitutional purposes. The Department argues that because satellite and cable have different structures, methods of operation, and regulatory obligations, they are not similarly situated. The Department has the better of the argument.
Tracy was a challenge to the application of Ohio’s general sales and use tax to interstate natural gas transmission companies, where local distribution companies (“LDCs”) were exempt. The court observed that LDCs were heavily regulated territorial monopolies, burdened by “a typical blend of limitation and affirmative obligation.” Each LDC was required to submit annual forecasts of supply and demand; to “comply with a range of accounting, reporting and disclosure rules”; to obtain PUC permission before it could issue securities or enter into certain contracts; to submit to detailed regulation of rates, termination of service, and backup supply; and to serve all members of the public in its geographic territoiy without discrimination. 519 U.S. at 295-97.
The fact that the local utilities continue to provide a product consisting of gas bundled with the services and protections summarized above, a product thus different from the marketers’ unbundled gas, raises a hurdle for GMC’s[10] claim that Ohio’s differential tax treatment of natural gas utilities and independent marketers violates our “virtually per ■ se rule of invalidity” prohibiting facial discrimination against interstate commerce.
Id. at 297-98. That the two business models competed, to a degree, for the same customers did not mean that the state could not differentially tax their products. To the contraiy, the court saw this as reason for concern that equating the highly regulated LDCs, for tax purposes, with the comparatively unregulated interstate marketers could “affect[ ] the overall size of the JDCs’ customer base,” thereby degrading their ability “to serve the captive market where there is no such competition.” Id. at 307.
The plaintiffs rely in large part on Bacchus Imports, LTD v. Dias, 468 U.S. 263 (1984), Family Winemakers of California v. Jenkins, 592 F.3d 1 (IstCir. 2010), and Island Silver & Spice, Inc. v. Islamorada, 542 F.3d 844 (11th Cir. 2008), to support their contention that cable TV and satellite TV are similarly situated and so must be identically taxed. In all three of these cases, however, the courts concluded that the discriminatoxy statute or regulation was based entirely on protectionist distinctions between in-state and interstate businesses. See Amerada Hess, 490 U.S. at 77 and discussion, infra.
In Bacchus, the United States Supreme Court held invalid the Hawaii excise tax on liquor because it exempted okelehao and fruit wines. “Okelehao is a brandy distilled from the root of the ti plant, an indigenous shrub of Hawaii,” and pineapple wine was also manufactured locally. 468 U.S. at 265. There was clear legislative history demonstrating that the reason for the tax exemptions was “to encourage and support the establishment of a new industry” within Hawaii. Id. at 271. The tax exemption was thus discriminatory in both purpose and effect.
Similarly, in Family Winemakers, the First Circuit struck down as discriminatory a Massachusetts statute that allowed only “small” wineries to obtain a license that allowed them to ship wine in three ways: directly to consumers, through wholesalers, or through retail distribution. 592 F.3d at 4. “Large” wineries, by contrast, had to choose between applying for a license that allows them to distribute their product directly to consumers, or distribute wine exclusively through wholesalers; they could not do both. Id. All wineries in Massachusetts are “small,” in that they produce less than 30,000 gallons of grape wine annually; [11] there are no “large” wineries in Massachusetts. Id. The Court held that the gallonage cap changed the competitive balance’ so as to benefit significantly the Massachusetts wineries and burden significantly the out-of-state wineries, and that “(t]he advantages afforded to ‘small’ wineries bear little relation to the market challenges caused by the relative sizes of the wineries.” Id. at 5. Added to this, as in Bacchus, was compelling evidence of a protectionist purpose.[12] This made the law “virtually per se invalid,” salvageable only upon a showing that “it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.” Id. at 18-19, quoting Kentucky Department of Revenue v. Davis, 128 S.Ct. at 1808.
In Island Silver, a town ordinance restricted so-called “formula” retailers (large retail chains) to a certain square footage and frontage, limited so as to be incompatible with the large area that these nationally branded retailers require. 542 F.3d at 846. The effect was to prevent the plaintiff, a local mixed use retailer, from selling its real estate to a developer planning to establish a Walgreen’s drugstore on the same footprint. Id. at 845. The Eleventh Circuit held that the provision was subject to heightened scrutiny because it effectively eliminated all new interstate retailers. Id. at 846-47. Although the purported purpose of the law—preserving a small town character— was deemed “legitimate” in theory, the number of existing chain stores and dearth of historic structures in the vicinity of Island Silver’s property supported the district court’s finding that “[Islamorada] has not demonstrated that it has any small town character to preserve,” and thus had “failed to provide a legitimate local purpose to justify the ordinance’s discriminatory effects.” 542 F.3d at 847-48.[13]
All three of these cases—none of which involved explicit, or even very precise, discrimination between intra-and interstate commerce—might fairly be re *54 garded as close, were it not for the clarity of the legislative history. The present case is different, however, in a more fundamental respect. The dormant Commerce Clause protects the interstate market, not particular interstate firms, or even particular structures or methods of operation within a market. Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127-28 (1978). Differential tax treatment of different modes of operation is not unconstitutional, where the “different effect... on these two categories of companies results solely on the nature of their businesses, not from the location of their activities.” Amerada Hess, 490 U.S. at 78 (holding that state tax code denying deduction for federal windfall profit tax on crude oil did not unconstitutionally favor local, independent retailers over large interstate oil companies).
It should come as no surprise, therefore, that every court to have considered the issue so far has concluded that the Commerce Clause does not prohibit differential taxation of providers that deliver programming by satellite as opposed to cable. See, e.g., DIRECTV, Inc. v. Treesh, 487 F.3d 471, 480 (6th Cir. 2007) {.“Treesh”), cert, denied, 552 U.S. 1311 (2008); DIRECTV, Inc. v. North Carolina 178 N.C.App. 659, 667 (2006) {“North CarolineC); DIRECTV, Inc. v. Levin, 128 OhioSt.3d 68, 74 (2010), cert, denied, _ S.Ct. _ (6/25/12) {“Levin”); DIRECTV, Inc. v. Tolson, 498 F. Sup.2d 784, 800 (E.D.N.C. 2007) (dismissing the satellite companies’ complaint on other grounds but citing with approval Treesh and North Carolina).
All four of these cases involved sales taxes, though they examined two distinct systems. In North Carolina and Levin, North Carolina and Ohio had imposed a straightforward sales tax on satellite providers but not on cable providers. By the time of the Tolson decision, however, the North Carolina legislature had overhauled the tax code so that both cable and satellite companies paid sales tax at the same rate, but cable providers were relieved of paying franchise taxes to the municipalities in which they operated; instead, the state distributed sales tax revenues from cable and satellite providers to local governments, some of which had previously received franchise revenues. The new North Carolina law was very similar to the Kentucky system earlier upheld in Treesh.
All four courts rejected the satellite companies’ challenges, reasoning that the dormant Commerce Clause protects the interstate market for a particular product, but not the particular structure or method of operation in a retail market. Treesh, 487 F.3d at 480. Accord Levin, 128 OhioSt.3d at 75; North Carolina, 178 N.C.App. at 667-68. These courts have simply applied, to the pay TV industry, the holdings in Amerada Hess and Exxon that there is no violation of the Commerce Clause when differential tax treatment has nothing to do with the geographical location of the companies or their economic activities, and everything to do with the manner by which they distribute programming. See, e.g., DIRECTV v. Treesh, 469 F.Sup.2d 425, 439 (E.D.Ken. 2006), affd 487 F.3d 471, 480 (6th Cir. 2007). Although under the Exxon rule, the dormant Commerce Clause would prohibit discrimination against the interstate market for multichannel video programming, it does not prohibit a differentiation between programmers in that interstate market who deliver programming by satellite and those who deliver by cable. Id. at 440.
In the present case as in those, there can be no suspicion that the tax in question was intended to protect local pay-TV providers from out-of-state competition; all of the competitors—satellite and cable— are large out-of-state companies with regional or national footprints. Moreover, although the satellite and cable companies offer much the same programming and thus compete for many of the same customers,[14] they go about it with different modes of operation, using very different physical infrastructures, and operating in markedly different regulatory environments, much as in Tracy. It follows that satellite TV and cable TV are not similarly situated for Commerce Clause purposes, and that the satellite tax does not discriminate against the satellite providers based on geography.
B. Discriminatory Purpose
The fact that cable and satellite providers are not similarly situated effectively sidelines any concern over the purpose behind their differential tax treatment. Nonetheless, the plaintiffs argue that the Legislature enacted the satellite-only tax with the intent to favor the local economy, thus purposefully discriminating against out-of-state interests in violation of the Commerce Clause. See, e.g., Amerada Hess, 490 U.S. at 75. The evidence they have provided of protectionist legislative intent, however, is singularly unconvincing.
The centerpiece of the plaintiffs’ argument on discriminatory intent consists of multiple communications from NECTA, its lobbyist, and Comcast to members of the Legislature. Some of these argue that cable had a larger economic footprint in the Commonwealth and made significant investment in Massachusetts in terms of jobs and infrastructure, while satellite did not—evidence, according to the plaintiffs, of discriminatory intent on the part of the legislators thus lobbied.
Statements of lobbyists, however, can furnish only the most attenuated and unreliable evidence of legislative intent.
Legislative history is problematic even when the attempt is to draw inferences from the intent of duly appointed committees of Congress. It becomes far more so when we consult sources still more steps removed from the full Congress and speculate upon the significance of the fact that a certain interest group sponsored or opposed particular legislation.
*55 Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 120 (2001).
The statements offered up in this case here are exemplary of the problems with this sort of evidence. The “local jobs” pitch[15] was made most directly in a letter sent by NECTA to every legislator, yet even here it is only one of several arguments for the tax:
Unlike cable companies, satellite providers pay no personal properly or real estate taxes. Unlike cable, they do not pay to support public and government access channels. And unlike cable, they do not provide free video service to municipal buildings and free video and high-speed internet to schools and libraries.
Nor do satellite companies make investments in the economy or community, as cable providers do. Comcast alone, for example, employs more than 5,000 people in Massachusetts who collect more than $336 million in salary and benefits. Over the past seven years, Comcast has made $1.8 billion in capital investments in Massachusetts while donating more than $15 million to charity.
(Jt. App. Ex. 50, 51.)
Other communications by NECTA, its members, and its lobbyists with legislators, other government officials' and the public analyzed the legality of the bill and repeatedly intoned, ‘Tax parity is the goal,” mentioning in-state jobs and infrastructure improvements only in passing or not at all. (Jt. App. Ex. 37, 44, 45, 47-49, 52, 53, 61, 64-66, 69, 70, 72, 96.) To suppose from this evidence that the General Court as a whole— or even any individual legislator—voted for the satellite tax as a jobs measure, as opposed to a revenue-raising and tax parity measure, is conjectural to an impermissible degree.
The plaintiffs claim, however, to have it from the horse’s mouth, in the form of statements reportedly made to Andrew Reinsdorf, senior vice president of government relations for DIRECTV, by “half a dozen to a dozen” legislators whose names he cannot remember. “My general recollection of those meetings,” Reinsdorf testified, “was that generally most all of the legislators I met with, in part, relayed or expressed or voiced the view that cable has a significant local presence; that cable does PEG[16] programming; that cable employs lots of my constituents.” He heard from someone else that Senator Rosenberg was “particularly adamant” on these issues., (Jt. App. Ex. 32 at 57-58, 61.)
Even putting aside the infirmities of this particular testimony, “statements attributed to individual legislators as to their motives or mixtures of motives in considering legislation are not an appropriate source from which to discover the intent of the legislation.” Administrative Justice of the Housing Court Dep’t v. Commissioner of Admin., 391 Mass. 198, 205 (1984); accord, Finch v. Commonwealth Health Ins. Connector Auth., 461 Mass. 232, 240 n.6 (2012); Boston Water & Sewer Comm’n v. Metropolitan Dist. Comm’n., 408 Mass 572, 578 (1990).
Finally, the plaintiffs see evidence of discriminatory intent in what they call a “backdoor” process and the Legislature calls “outside sections.” Although this device has been the subject of periodic criticism from individual legislators, the other branches of government, and the citizenry, the Supreme Judicial Court has been
reluctant to reject the use of “outside sections” as a means to enact amendments to general legislation. “This court traditionally has avoided involvement in the internal workings of the Legislature in deference to the unique role of the Legislature and its expertise with regard to internal legislative processes.” “In these circumstances, mindful of the principle of separation of powers so carefully stated in art. 30 of the Declaration of Rights, this court should not infer specific constitutional procedures that the . . . legislative branch! ] . . . must follow.”
First Justice of Bristol Div. of the Juvenile Court Dept, v. Clerk-Magistrate of Bristol Div. of the Bristol Juvenile Court Dept., 438 Mass. 387, 408 (2003) (citations omitted). Outside section or no, the proposed measure was no secret from the satellite industry (which lobbied against it) or, apparently, from its customers. (Jt. App. Ex. 54, 84.) Finally, the plaintiffs make no connection between the use of the outside section process and any supposed intent to discriminate against interstate commerce.
In short: the plaintiffs have not shown that the satellite tax had any purpose beyond the obvious: raising revenue, by taxing an industry sector that was rationally viewed as undertaxed. Accordingly, where cable and satellite are not similarly situated, and where there is no evidence of discriminatory effect or purpose, the plaintiffs’ claim of a commerce clause violation fails.
2. Violation of the Equal Protection Clause
The plaintiffs additionally argue that the imposition of satellite tax violates the Equal Protection Clauses of the Constitutions of the United States (Am. XIV) and Massachusetts (Arts. I, X) because it arbitrarily distinguishes between similarly situated businesses without any rational basis related to a legitimate state policy. The analysis is the same under both constitutions. Brackettv. Civil Service Comm’n, 447 Mass. 233, 243 (2006). Absent a suspect classification or a fundamental right (neither of which is present here), however, there is no equal protection violation if the statutory distinction in question has a rational basis. Armour v. City of Indianapolis, 132 S.Ct. 2073, 2080 (2012); Finch at 668-69.
“(Cheating classifications and distinctions in tax statutes” is a domain in which “ [legislatures have especially broad latitude.” Armour at 2080, quoting *56 Regan v. Taxation With Representation of Washington, 461 U.S. 540, 547 (1983). “So long as any basis of fact can be reasonably conceived showing that the distinction made by a tax statute has a fair and rational relationship to the object sought to be accomplished, the legislative classification is not violative of equal protection principles.” Seiler Corp. v. Commissioner of Revenue, 384 Mass. 635, 639 (1981).
The enactment of the satellite tax came at a time when Massachusetts was in the throes of a fiscal crisis. The Legislature was faced with a looming revenue shortfall, and it chose, as a small part of the solution, to tax a sector whose existing regulatory and fiscal obligations to the sovereign were reasonably perceived as modest when compared to those of the rest of the pay-TV industry. This was a plausible and entirely legitimate reason for the tax classification. “(T]he legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.” Armour, supra. The plaintiffs’ claim of a violation of the equal protection clauses of both the United States Constitution and the Massachusetts Constitution therefore fails.
ORDER FOR JUDGMENT
For the forgoing reasons, plaintiffs DIRECTV, L.L.C. and DISH NETWORK, LLC’s Motion for Summary Judgment is DENIED. Defendant Commonwealth of Massachusetts, Department of Revenue’s Motion for Summary Judgment is ALLOWED.
Judgment shall enter, declaring that Chapter 64M of the General Laws is lawful under Article 1, §8, cl. 3 of the United States Constitution (the commerce clause) and under the equal protection clauses of the of the Fourteenth Amendment to the United States Constitution and Articles I and X of the Massachusetts Constitution.

The major cable providers are Comcast Corporation and Charter Communications, Inc., which are cable television providers, and Verizon Communications, Inc. which is a wire-line telephone company. Verizon is not meaningfully different from the cable companies in terms of local assembly and ground-based distribution of Verizon pay-TV service.

Each plaintiff had distribution agreements with different retailers.

In 2010, for example, cable TV providers operated and maintained more than 60 headend facilities in Massachusetts operated by a staff of trained employees. These providers also used contractors to build and install new equipment in the facilities.

In 2011, cable TV providers used more than 30,000 miles of fiber-optic and coaxial wire to distribute programming to Massachusetts customers, and used independent contractors for some aspects of construction.

he parties’ stipulation stops here, but it is judicially noticeable that the other major cable companies (Verizon, Cox Communications, Time Warner Cable, and RCN) likewise are headquartered outside of Massachusetts and have substantial regional or national footprints.

Some of NECTA’s lobbying materials refer to the measure as the “Massachusetts Tax Equalization Act.” Satellite, meanwhile, was urging legislators to “Support Fair Taxation in the Video Marketplace” by “Reject[ing] Senate Bill 1314.” (Jt. App. Ex. 47, 54.)

General Laws c. 64M, §2, the pertinent statutoiy provision, is entitled “Excise on direct broadcast satellite service; rate; time of payment” and reads as follows:
An excise is hereby imposed upon the provision of direct broadcast satellite service to a subscriber or customer by any direct broadcast satellite service provider in an amount equal to 5 per cent of the direct broadcast satellite service provider’s gross revenues derived from or attributable to such customer or subscriber. A direct broadcast satellite service provider shall pay the excise to the commissioner at the time provided for filing the return required by section 16 of chapter 62C.

This construction is not universally embraced, even in high places, but it is the law of the land. See General Motors Corp. v. Tracy, 519 U.S. 278, 312-13 (1997) (Scalia, J., concurring), and cases cited.

The plaintiffs do not argue that the satellite tax statute is discriminatory on its face, and the Court agrees.

General Motors Corporation, a large industrial consumer of natural gas for its manufacturing plants in Ohio, purchased nearly all of it directly from independent out-of-state marketers. 519 U.S. at 285.

There was legislative history suggesting that the exemption for non-grape fruit wine was inserted to prevent a particular Massachusetts winery from exceeding the 30,000 gallon limit.

The statute replaced an earlier vision which explicitly made the combined-distribution license available only to in-state wineries, and had recently been ruled unconstitutional. The sponsor of the new legislation explained to the General Court that “with the limitations that we are suggesting in the legislation, we are really still giving an inherent advantage indirectly to the local wineries.” 592 F.3d at 12-13. See also the preceding footnote.

Other stated justifications—encouragement of small scale and water-oriented uses, preservation of the natural environment, and avoidance of increased traffic congestion, litter, garbage and rubbish—were also rejected as inaptly served by the ordinance. The court was polite enough not to observe that what the ordinance did serve tolerably well was the interests of the local business community.

Cable providers, of course, are limited to the cities and towns that have granted them franchises. Satellite providers can reach all of these customers, and also those who live far beyond the reach of cable. In any event, “[ajlthough competing in different markets or offering different products generally means that entities are not similarly situated, see Tracy, 519 U.S. at 299, competing in the same market is not sufficient to conclude that entities are similarly situated, as Tracy made clear.” NationalAss’n of Optometrists v. Brown, 567 F.3d 521, 527 (9th Cir. 2009).

This and, even less directly, the references to infrastructure improvements are the only arguments having even a whiff of economic protectionism, and that only by proxy; the cable companies are no more local Massachusetts concerns than the satellite companies are. Tax equity is not a protectionist purpose. Nothing in the record suggests that satellite companies are any less able than cable companies to provide local access programming, video service to schools, libraries and other public buildings, and donations to charity, and even if it were so, it would be a mode-of-operation issue, not an interstate commerce issue.

Public, educational and governmental.